**Ronald DAVIS, Petitioner,**

v.

**Wayne STRACK, Superintendent, Fishkill Correctional Facility, and Dennis Vacco, New York State Attorney General, Respondents.**

**No. 97 Civ. 5375(RMB)(AJP).**

United States District Court,
S.D. New York.

April 17, 2000.

Frances A. Gallagher, The Legal Aid Society, New York City, for Petitioner.

Rona Z. Feinberg, Asst. District Attorney, New York City, for Respondents.

## ORDER

BERMAN, District Judge.

### INTRODUCTION

On or about July 11, 1997, Ronald Davis ("Davis" or "Petitioner") filed a petition, pursuant to 28 U.S.C. § 2254(d), for a writ of habeas corpus ("Petition") in the United States District Court, Southern District of New York. Davis had been convicted in 1994 in New York State Supreme Court, New York County, of manslaughter in the second degree (N.Y. Penal Law § 125.15) and sentenced to seven to twenty-one years imprisonment for fatally shooting Eddie Ray Leonard, also known as "Bubblegum" ("Bubblegum"). In his Petition, Davis argues that the trial court's refusal to charge the jury with respect to the defense of justification violated his due process rights under the Fourteenth Amendment. On April 13, 1999, the Honorable Andrew J. Peck, United States Magistrate Judge, Southern District of New York, to whom the matter had been referred, issued a Report and Recommendation ("Report"), recommending that Mr. Davis' Petition be denied on the merits. Petitioner timely filed Objections to the Report ("Objections") with the Court; the State of New York (through the Office of

Robert Morgenthau, District Attorney, New York County) filed Respondent's Reply to Petitioner's Objections to the Magistrate Judge's Report ("Reply").

For the reasons set forth below, the Court adopts Magistrate Peck's Report in all material respects and concludes both that Petitioner's writ of habeas corpus is not procedurally barred and that it should be denied on the merits.

## FACTUAL BACKGROUND

The facts are undisputed and include the following:

**Petitioner Davis, on June 20, 1992, shot Bubblegum five times in the back and killed him. At the time of the shooting, Bubblegum did not have a gun.**

Although Davis knew Bubblegum all his life, the two were adversaries. Davis had regarded Bubblegum as "a bad guy, a stick up kid, robbing people." (Report at 393 quoting Davis, Tr2. at 34.) Davis testified at his trial that he would "go the other way" from Bubblegum because he "didn't want to have no problem [sic]." (*Id.*) Davis had three negative encounters with Bubblegum over the years prior to the day of the shooting. Bubblegum, according to Davis, twice robbed Davis (1984, 1986) and also raped him during a 1992 encounter ("third incident"), threatening to kill him on two of those occasions.[1] None of these incidents were reported to the police "because [Davis] was getting [his] money from numbers. They wouldn't have done nothing about it. And plus, that is snitching." (Report at 394 quoting Davis, Tr2. at 40.) After the third incident, Davis went to Maryland. He returned to New York

three to four weeks later on June 19, 1992, "so that he could be with his family on his birthday on June 21." (Report at 396.)

Magistrate Judge Peck outlined the following events leading up to and including the shooting of Bubblegum by Davis. (Report at 6–13). On June 20, 1992, after running numbers in the morning, Davis came out of a grocery store on the corner of 146th Street and Amsterdam Avenue (in Manhattan) at 9:00p.m. and stood with his friend "Little Will." (Davis, Tr2. at 55, 95–99.) Davis "looked over" and saw Bubblegum who was standing two cars down on Amsterdam Avenue. (*Id.* at 55–56, 96.) Davis made eye contact with Bubblegum, and Bubblegum looked in his direction while talking to "another guy." (*Id.* at 56–57, 101–102.) Ellen Symonette[2] testified that Bubblegum had just come out of a drug prone location with eyes that were "bugging out" and "sweating real like popping out real sweats" and that Bubblegum looked "nervous." (Symonette, at 485–87, 501.)

**Davis testified that he was afraid of Bubblegum as soon as he saw him.** (Davis, Tr2. at 103.) Thereupon, Davis went around the corner to "get a gun" from a man named Red at "the spot," i.e. the place where Davis took the numbers he ran and where drugs were dealt. (*Id.* at 57–58, 102–103.) **Davis looked to see if Bubblegum was following him. He was not.** (*Id.* at 103–106 (emphasis added).) In "the spot," Davis told Red that "the guy who robbed [him] was downstairs," and Red gave him a chrome plated .38 revolver. (*Id.* at 58, 110.) Davis checked that the gun was loaded. (*Id.* at 110–111.)

---

1. Davis testified that Bubblegum robbed Davis first when Davis was "15 or 16" (i.e. 1984), two years later when he was "about 18" (i.e. 1986), and again in 1992, three to four weeks before the day of the shooting. (Report at 393–95.)

2. Ms. Symonette was, apparently, selling electronics on Amsterdam Avenue between 146th and 147th Streets. (Symonette, Tr1. at 485.)

Davis got the gun, he said, "[b]ecause last time [Bubblegum] left [Davis] he told [Davis] he was going to kill [Davis]." (*Id.* at 58.) Davis testified that he did not intend to kill Bubblegum, but he "wasn't going to let [Bubblegum] hurt [him] again." (*Id.* at 59, 111.)

When Davis came out of the building with the gun, he did not see Bubblegum (*Id.* at 112). He conceded that he could have left the area or stayed (presumably safely) at "the spot," but did not because he "wasn't thinking right." (*Id.* at 59, 107, 112–114.) "All [Davis] was thinking about was the last time [Bubblegum] raped [him]." (*Id.* at 107.) **Instead, Davis went back out onto the street and found the place where Bubblegum previously stood.** (*Id.* at 58–59, 113–114.) At first Davis saw the man with whom Bubblegum had been standing, but did not see Bubblegum. (*Id.* at 58–59.)

At approximately this point in time, Symonette had stopped Bubblegum and "asked him [if he] want[ed] to buy a phone." (Symonette, Tr1. at 487.) Bubblegum called his wife from a phone booth to discuss buying the phone. (*Id.* at 488–89, 503–04, 516–18.) On direct examination, Symonette testified that Bubblegum said "[']there is something I have to take care of you know. I am going to take care of it and I still want the phone.... [']" (*Id.* at 490.) On cross examination by defense counsel, Symonette said that when she went (back) up to Bubblegum he looked agitated and when she said "what's wrong" he said he wanted the phone and just stood there. (*Id.* at 520.) Symonette also testified that Bubblegum said " 'I have to hit this guy off.' " (*Id.* at 506–07.) Bubblegum had a brown bag in his right hand and the telephone in his left hand. (*Id.* at 521–22.)

At about this time, Davis spotted Bubblegum (again) at "the entrance of the school closer to 147th Street," up the block on the other side of the street. (Davis, Tr2. at 59, 62.) Davis walked "across the street [in Bubblegum's general direction] and tried to ring [his] friend" Gregory Reid's doorbell allegedly "[t]o get out of the street and away from [Bubblegum]," although geographically—with a loaded .38 chrome handgun—**Davis was going toward the danger (i.e. Bubblegum) instead of away from it.** (*Id.* at 60–61, 114–115.) Davis testified that no one answered Reid's bell, and Davis could not get into Reid's building without being buzzed in. (*Id.* at 61–64.) Davis "[s]tepped down from off the building because [Bubblegum] was coming [his] way. [Davis] didn't want to get trapped in the hallway" of Reid's building. (*Id.* at 62.) Davis put his back against the wall. (*Id.* at 64.) Bubblegum "just stood there looking at him and [Davis] was looking at the guy across the street." (*Id.*) Bubblegum and Davis made eye contact. (*Id.* at 126.) At this point Bubblegum was about fifteen to twenty feet away from Davis. (*Id.* at 124–25.)

Bubblegum started to walk toward Davis; Bubblegum was "looking at [Davis] but he was talking to [Symonette]. As [Bubblegum] got closer and closer [Davis] was looking... at him and the guy across the street—[Davis] was scared." (*Id.* at 65.) "[Davis] didn't want to get shot in [his] back." (*Id.* at 65–66.)

According to Davis, Bubblegum walked past Davis, turned, and reached to his left with his hand at his waist. (*Id.* at 65–66, 72–73, 139.) Davis was on Bubblegum's left side. (*Id.* at 66.) Davis "thought [Bubblegum] was going to shoot [him]," although he did not see a gun on Bubblegum. (*Id.* at 72–73, 132–33.) **Davis ran behind Bubblegum to the right, so that Bubblegum would always have his back to him.** (*Id.* at 67, 146–47, 191.) Davis said that at that point he was "stuck;" he

"panicked," and could not run away. (*Id.* at 141–44.)

**At this point, Davis aimed his .38 revolver and shot Bubblegum five times in the back.** (*Id.* at 68; *see also* Hayes, Tr1. at 630, 636, 646 (Bubblegum had five bullets in his back).) As Bubblegum fell, wounded, Davis kept shooting. (Davis, Tr2. at 69.) Davis then ran down the hill, threw the gun away, and went home. (*Id.* at 69–71, 153.)

On January 6, 1993, the police arrested Davis. (Sgt. Hollifield, Tr1. at 281–86; Detective Mooney, Tr1. at 586.) Detective Mooney "explained to [Davis] that...[he] had several eyewitnesses to the case and that [he] knew that [Davis] was the person who shot [Bubblegum]." (*Id.* at 587.) Detective Mooney advised Davis of his Miranda rights. (*Id.* at 587–92.) **Initially, Davis lied and said that he had not been present at the shooting, but had (instead) been at a party.** (*Id.* at 593–97; *see also* Davis, Tr2. at 71–72, 163–65.) Thereafter, Davis recanted, confessed to shooting Bubblegum, and gave a second statement, which he went over with Detective Mooney two or three times, before Mooney wrote it down and Davis signed it. (Mooney, Tr1. at 601–03; Davis Tr2. at 166–67.)

At trial, Detective Mooney read Davis' confession into the record:

I knew Bubblegum almost all my life since I have been in the street. When I was about 15 or 16 years old he robbed me and a friend of mine named Greg Pearce. *He put a gun to our heads,* made us strip butt naked and took all our money.

A couple of years later when I was about 18 or 19 years old, I was by

myself and Bubblegum grabbed me again. *He had a gun* and went into my pockets and took my money.

About a month before Bubblegum was killed, he was with another guy. I don't know his name. They grabbed me on 146th Street by Amsterdam Avenue at the spot I used to be at (508 West 146th Street). They took me up to the roof. They made me strip butt naked and *Bubblegum was saying kill his ass about three times.* The other guy said we got the money, why should we kill him. Then Bubblegum said f-ck that, kill him. Kill him. Then the other guy didn't want to do it and said we got the money. Come on, man and the two of them left out the building arguing.[3]

After the last time he robbed, I saw him three or four times on the street but I kept hiding from him because I knew he was going to rob me again.

On 6/20/92 I was hanging out in front of the store on 146th Street and Amsterdam Avenue near 508 West 146th Street. I saw Bubblegum walking on the same side of the street with a guy. He looked at me. There was a girl in his company but he was talking with the guy. The guy he was talking with stayed on the corner and Bubblegum and the girl walked up to 147th Street.

I figured it was a set up because of the way it looked with the guy staying on the corner by me so I walked across the street. Then Bubblegum crossed over to the same side I was on at 147th Street and started to walk back towards me. He was looking at me. I was watching him and the other guy across the street. He kept looking sideways at me and then he stepped off the curb at

---

**3.** Davis did not mention the alleged rape by Bubblegum in his written (confession) statement. Davis explains that his attorney was the first person with whom he had ever discussed the rape. (Report at 395.)

146th Street and he started to turn back toward me and I shot him.[4]

*I thought he was going to try to grab me again like he usually do [sic]. I thought he had a gun like he did all the other times.* I don't remember how many times I shot him because *I was scared. I was scared so I didn't wait to see if he had a gun. I just beat him to the draw.* I didn't give him a chance to say anything to me. I was too scared. I didn't see the other guy across the street with a gun either.

After I shot, I ran down the hill toward Convent Avenue and I threw the gun down by where the garbage cans go in front of the building. Then I ran home to my mother's house. I got the gun from the spot. All I know is that it was a chrome .38.

(Report at 399–400 (citing Mooney, Tr1. at 605–08) (emphasis in original).)

Davis consented to having his confession videotaped, and the tape was introduced into evidence and played for the jury. (*Id.* at 609–11, 652.)[5]

## PROCEDURAL BACKGROUND

### Trial Court's Instructions

Prior to summations, the trial judge advised counsel that she did "not intend to charge justification because [she did] not believe the record supports a justification charge." (Colloquy, Tr2. at 291; *see also id.* at 294–95.) The trial judge stated:

You know the duty to retreat is written. The case law is there...It is very clear the defendant has a duty to retreat. The only case I have seen that would even remotely suggest that this defendant when he says he saw the deceased

and went into a panic did not have a duty to retreat was the case, I think it is [*People v.*] *Rivera* [, 138 A.D.2d 169, 530 N.Y.S.2d 802, appeal denied, 72 N.Y.2d 923, 532 N.Y.S.2d 857, 529 N.E.2d 188 (1988) ].

The critical difference between that case and this case however is that the record there supported a different scenario.

(*Id.* at 295) During further colloquy about a justification charge, the trial judge summarized her understanding of the law:

First the defendant must establish that, one, he reasonably believed that there was about to be the imminent use of deadly physical force for which he should repel that force; and two, that he satisfied his duty to retreat or was under no such duty to retreat. *People v. Watts* [, 57 N.Y.2d 299, 456 N.Y.S.2d 677, 442 N.E.2d 1188(1982) ].

(Colloquy, Tr2. at 301–02.) Defense counsel argued that "this is a factual question. This is not a legal question... I would also strongly object to the Court charging the duty to retreat language." (*Id.* at 307.) Defense counsel argued further that if, "after retreating and being safe, the defendant could encounter a situation where he was in danger,...the court would then have to evaluate whether or not he was under an obligation and duty to retreat." (*Id.* at 310–11.) The trial judge responded that she "was going to look at this in the light most favorable to the defendant" (*id.* at 311), and then proceeded to summarize for counsel her view of the evidence in the light most favorable to Davis:

If true, if completely true, then the defendant would have us believe the following: That he was deathly afraid of

---

4. In his written statement, Davis also does not explain that (or why) he left Bubblegum after initially encountering him; got a gun; and then returned to the place where he had encountered Bubblegum.

5. The Magistrate Judge was not provided with the videotaped confession.

the deceased. Two, that he had a good reason to be deathly afraid of the deceased. Three, that on the date of this incident he was not at his home nor was he still at his place of business because he said he had finished doing his number running business for the day long before this incident occurred at nine o'clock at night, three; and so to infer from that he was there. He wanted to be there. I guess he likes this area even though he knows, he said, the person he most feared in the world lived in that area.

Four, that shortly before the shooting he saw the person he most feared and feelings of what could be described as sheer panic, overwhelmed him and he left the area. While there may have been some staring...there was no physical encounter. The defendant walked away. That he walked down 146th Street towards Broadway and the only thing that prevented him from continuing down towards Broadway and going any place he wanted to go was his own choice to go get a gun and to protect himself.

That he went into this apartment where he knew there was a gun, and he knew the people and told them that the person he was most fearful of who had robbed him was out on the block meaning Amsterdam Avenue and they gave—this I don't believe—they gave him a gun. I am sure he asked for that gun, but that's okay, but in any event, he gets the gun. He doesn't sit there. He doesn't wait until dark, whatever. He just goes back out on the block. He came back outside. He looked up and down 146th Street to one avenue to the other. He didn't see anybody and again instead of going away from the danger, where he knows the danger is and frequents because he has had this encounter with him on 146th Street and Amsterdam Avenue for

at least three occasions, he walked towards Amsterdam Avenue.

Now, my question and then when he gets to Amsterdam Avenue and 146th Street he sees the deceased a block away on 147th Street, that he did not walk back to where he knew was a safe avenue because he had just come from there and he knew those people were home but rather—and this is the first time we heard anything about this at trial—he walked across the street to a building he couldn't get in because he knew the door would be locked and could only get in if someone answered the door and no one answered it, so my question is very simple. Is the defendant—is there evidence that one could rationally conclude that the defendant's actions were those of a reasonable man acting in self-defense who has a duty to retreat? That is, if the defendant has a duty to retreat and I submit he does and successfully retreats as I maintain he does, can he thereafter invoke self-defense by putting himself back in the same position with the gun at the ready?

(*Id.* at 311–15.)

The trial judge advised counsel that she "would not charge justification" (*id.* at 345, 358, 360), but would (and did) charge the affirmative defense of extreme emotional disturbance (*e.g.*, *id.* at 478). Defense counsel took exception to the ruling. (*Id.* at 345–46, 356, 358–59, 504.)

The jury found Davis guilty of manslaughter in the first degree and guilty of criminal possession of a weapon in the second degree. (*Id.* at 540–545) He was found not guilty of murder in the second degree. (*Id.*) On September 8, 1994, Davis was sentenced to concurrent prison terms of seven to twenty-one years on the manslaughter count and five to fifteen years on

the weapons count. (Sent. Tr. at 18–19; *see also* Pet. ¶¶ 1–4.)

## State Court Appeal

Davis timely appealed his conviction to the Appellate Division, First Department. Davis challenged his conviction on the (sole) ground that the trial court's refusal to give the justification charge "deprived [Davis] of his due process right to a fair trial," citing the Fourteenth Amendment of the United States Constitution and the New York State Constitution. (Davis Appendix: Davis 1st Dep't Br. at 36, 48.) This is the (same) basis for the instant Petition.

On October 8, 1996, the Appellate Division affirmed Davis' conviction. *People v. Davis*, 232 A.D.2d 209, 648 N.Y.S.2d 79 (1996). The Appellate Division's decision reads as follows:

> The trial court properly declined to charge the jury on the defense of justification since there was no objective view of the evidence that would support a finding that defendant's belief that the victim was using or about to use deadly physical force was reasonable...at the time defendant fatally shot the victim. Although defendant testified that the victim reached toward his waist immediately before the shooting, defendant acknowledged that he did not see any weapon on the victim's person and that he did not give the victim a chance to turn around before repeatedly shooting him in the back. Defendant claimed that the victim kept looking at him right before the shooting and that defendant feared that the victim would again attack him as in the past. **However, defendant did not explain why that final encounter posed a threat of deadly physical force when their previous exchanges of glances minutes earlier did not.** Finally we note that defendant offered no convincing reason as to why

he did not retreat from the scene at the time of the actual shooting.

*Id.*, 648 N.Y.S.2d at 80 (emphasis added). The New York State Court of Appeals denied leave to appeal on December 31, 1996. *People v. Davis*, 89 N.Y.2d 921, 654 N.Y.S.2d 723, 677 N.E.2d 295 (1996).

## Habeas Petition

As noted, Davis filed the instant Federal habeas corpus Petition on or about July 11, 1997. The Petition raises a single ground for relief: the "[t]rial court's refusal to instruct the jury on the defense of justification deprived petitioner [Davis] of his due process right to a fair trial. U.S. Const. Amend. XIV." (Pet. ¶ 12(A); *see also* Davis Br. at 33–73; Davis Reply Br. at 6–11, 14–16).

## ANALYSIS

### Standard of Review

■ This Court may adopt those portions of the Report to which no objections have been made and which are not facially erroneous. *See Pizarro v. Bartlett*, 776 F.Supp. 815, 817 (S.D.N.Y.1991), *Letizia v. Walker*, 1998 WL 567840 at *1 (W.D.N.Y. Aug.27, 1998), *Nelson v. Smith*, 618 F.Supp. 1186, 1189 (S.D.N.Y.1985). The Court conducts a *de novo* review of those portions of the Report to which objections have been made. See *Pizarro*, 776 F.Supp. at 817, *Letizia*, 1998 WL 567840 at *1. Once objections are received, a District Judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. *See DeLuca v. Lord*, 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); *Walker v. Hood*, 679 F.Supp. 372, 374 (S.D.N.Y.1988); *East River Sav. Bank v. Secretary of Hous. and Urban Dev.*, 702 F.Supp. 448, 453 (S.D.N.Y.1988).

Here, the factual findings of the Magistrate Judge are not facially erroneous and

are not challenged by the parties. Thus, this Court adopts the Magistrate Judge's statement of facts in full. With respect to legal issues in the Report, objections have been lodged and, therefore, the Court has undertaken a *de novo* review.[6] The result of that review is that the conclusion recommended by the Magistrate, i.e. that Davis' Petition be denied, is accepted by this Court.

## Antiterrorism and Effective Death Penalty Act

The legal measure for habeas corpus review is contained in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and is as follows:

(d) An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was made based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West Supp.1998) ("Section 2254(d)").

## No Procedural Bar

■■■ Before addressing the merits of Davis' claim, Magistrate Judge Peck concluded that Davis' habeas petition was not procedurally barred, as New York State had argued. **This Court agrees.** A state prisoner seeking Federal habeas review of a state court conviction must first exhaust his available state court remedies. 28 U.S.C. § 2254(b) and (c). In order to satisfy the exhaustion requirement, a petitioner must "fairly present" the Federal nature of his claim to the state courts, thus giving the state courts a "fair opportunity" to hear the Federal claims that form the basis of the habeas petition. *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir.1982). A petitioner must inform the state courts of both the facts

---

**6.** In his Objections, Davis argues that, viewing the evidence in the light most favorable to the Defendant, he was not in imminent danger of deadly force during the initial meeting with Bubblegum on the day in question and was, therefore, not under any duty to retreat. (Objections at 2–3, 12–13.) The duty to retreat, Davis submits, did not arise until the moment Bubblegum reached toward his waist during the second encounter, at which point Davis was reasonable in believing he was in imminent danger of deadly force. (*Id.* at 14.) Davis argues that he never had a duty to retreat, i.e. not then and not in the first encounter. (*Id.* at 2–3, 14.)

Davis argues, alternatively, that even if he had been in imminent danger of deadly force during the first encounter and even if he had the duty to retreat from that encounter, he fulfilled that duty. (*Id.* at 3.) "After he re-

treated and retrieved a gun, he had every right to walk on the streets and return. If he again encountered his adversary and the encounter turned deadly, his duty to retreat would be evaluated anew at the point where deadly force became imminent again." (*Id.*)
The question is not whether it would have been "reasonable" or "appropriate" for Davis to retreat. The question is, instead, whether Davis had a legal duty to retreat and he certainly did not have such a duty until the evidence supported a reasonable fear of imminent deadly force...Davis would lose his claim to a justification defense only if, at the point when he first saw Bubblegum on the street before he retrieved the gun, the *only* reasonable view of the evidence was that the use of deadly physical force by Bubblegum was imminent. (*Id.* at 31–32.)

allegedly constituting the violation and "essentially the same legal doctrine he asserts in his federal petition." *Id.*

Magistrate Peck found correctly that Davis' constitutional argument was lodged in state court in that it was printed in a bold type heading in Davis' brief to the Appellate Division. "To suggest that the First Department did not read this boldtype heading to Davis' argument is, at best, speculation." (Report at 19.) Moreover, the United States Second Circuit Court of Appeals has held that even "a minimal reference to the Fourteenth Amendment satisfies the exhaustion requirement." *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992); *Fernandez v. Dufrain,* 11 F.Supp.2d 407, 415 (S.D.N.Y. 1998). *See also Joseph v. McGinnis,* —— F.Supp.2d ——, 1999 WL 595645 (S.D.N.Y. Aug.9, 1999).

This Court agrees with Magistrate Peck that Davis' constitutional argument was presented in his brief to the Appellate Division and, therefore, meets the (exhaustion) requirement for habeas review on the merits. *See, e.g., Jones v. Vacco,* 126 F.3d 408, 413–14 (2d Cir.1997); *Levine v. Commissioner of Correctional Servs.,* 44 F.3d 121, 124 (2d. Cir.1995); *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992); *Blissett v. Lefevre,* 924 F.2d 434, 438 (2d Cir.), *cert. denied,* 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). *See also Joseph v. McGinnis,* —— F.Supp.2d ——, 1999 WL 595645.

**Petitioner's Claim**

As noted, Petitioner's habeas claim "shall not be granted" unless he can satisfy the criteria set forth in AEDPA Section 2254(d). Petitioner's claim here does not satisfy those criteria.

**Habeas Relief Under Section 2254(d)**

The interpretation of Section 2254(d) has been the subject of some debate.[7] "The crux of the debate has been what degree of deference, if any, AEDPA requires a federal habeas court to accord a state court's construction of federal constitutional issues and interpretation of Supreme Court precedent." *Matteo v. Superintendent,* 171 F.3d 877, 885 (3d Cir.1999).[8]

---

7. It is also currently the subject of U.S. Supreme Court review in *Williams v. Taylor,* 163 F.3d 860 (4th Cir.1998), *cert. granted,* 526 U.S. 1050, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999).

8. Courts drawing distinctions generally have concluded that the phrase "contrary to" found in Section 2254(d)(1) refers to questions of law; the phrase "unreasonable application of" also found in Section 2254(d)(1) refers to mixed questions of law and fact; and the phrase "unreasonable determination of the facts" found in Section 2254(d)(2) refers to questions of fact. *See Matteo,* 171 F.3d 877; *Neelley v. Nagle,* 138 F.3d 917 (11th Cir.1998), *cert. denied,* 525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999); *Hennon v. Cooper,* 109 F.3d 330 (7th Cir.), *cert. denied,* 522 U.S. 819, 118 S.Ct. 72, 139 L.Ed.2d 32 (1997); *Drinkard v. Johnson,* 97 F.3d 751 (5th Cir.1996).

In *Drinkard,* the Fifth Circuit reasoned that, since subsection (d)(2) of Section 2254 supplies the applicable standard of review for questions of fact, "it is clear . . . that subsection (d)(1) provides the standards of review for questions of law and mixed questions of law and fact." *Drinkard,* 97 F.3d at 767. The Court understood the second clause of subsection (d)(1) to refer to mixed questions of law and fact. ("By its own language . . . it speaks of an 'unreasonable application of[ ] clearly established law.'" *Id.*) The first clause of subsection (d)(1) was said to refer to questions of law. ("[W]hen reviewing a purely legal question, a federal court may grant habeas relief only if it determines that a state court's decision rested on a legal determination that was 'contrary to . . . clearly established Federal law, as determined by the Supreme Court.'" *Id.*) The Seventh and Eleventh Circuits have also held that the "contrary to" language of Section 2254(d)(1) applies to pure questions of law and the "unreasonable application of" language of Section 2254(d)(1) applies to mixed questions of law and fact. *See Hennon,* 109 F.3d at 334; *Neelley,* 138 F.3d at 923–24.

The Second Circuit Court of Appeals has recently considered the application and interpretation of Section 2254(d)(1) in *Smalls v. Batista*, 191 F.3d 272 (2d Cir. 1999). In *Smalls*, the New York State Supreme Court Justice presiding over the trial against defendant Smalls, had given the jury a "supplemental" charge to encourage the jury (in the face of a deadlock) to reach a verdict. *See Smalls*, 191 F.3d at 275, 278 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 237–38 & n. 1, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988)). Following the charge, and further deliberation, the jury delivered a verdict convicting Smalls of robbery in the second degree. *See Smalls*, 191 F.3d at 275. Smalls was, thereafter, sentenced to a term of two to six years imprisonment. *See id.* at 275–276.

In his habeas petition, defendant Smalls claimed that "the trial court's supplemental charge improperly instructed jurors that they had a responsibility to convince the others and that the charge failed to instruct them that they were not to abandon their conscientiously held views." *Id.* The U.S. District Court (Sweet, J.) granted Smalls' request for habeas relief, after analyzing whether the state court's ap-

---

The First and Third Circuits take a somewhat different approach. *See Matteo*, 171 F.3d 877; *O'Brien v. Dubois*, 145 F.3d 16 (1st Cir.1998). The First Circuit in *O'Brien* interpreted subsection (d)(1) to require the following two-step inquiry.

First, the habeas court asks whether the Supreme Court has prescribed a rule that governs the petitioner's claim. If so, the habeas court gauges whether the state court decision is "contrary to" the governing rule. In the absence of a governing rule, the "contrary to" clause drops from the equation and the habeas court takes the second step. At this stage, the habeas court determines whether the state court's use (or failure to use) existing law in deciding petitioner's claim involved an "unreasonable application" of Supreme Court precedent. *O'Brien*, 145 F.3d at 24. The First Circuit further determined that to obtain relief under the "contrary to" language, "a habeas petitioner must show that Supreme Court precedent *requires* an outcome contrary to that reached by the relevant state court." *Id.* at 24–25 (emphasis added). Under the "unreasonable application of" language, the writ of habeas corpus should be granted only if the state court decision was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes." *Id.* at 25.

The Third Circuit has adopted a similar two-step inquiry, but departs in its interpretation of the "unreasonable application of" language. The Third Circuit has stated that the effect of the First Circuit's "unreasonable application of" standard "would be to render

the 'unreasonable application of' clause a virtual nullity, as granting habeas relief would require an explicit finding that the state court decision...was so far off the mark as to suggest judicial incompetence." *Matteo*, 171 F.3d at 889. Instead, the Third Circuit determined that habeas relief should not be granted under the "unreasonable application of" standard unless "the state court decision, evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent." *Id.* at 889–890, 891.

The Fourth Circuit has adopted yet another approach. Section 2254(d)(1) prohibits habeas relief, according to the Fourth Circuit, unless:

(a) the state court decision is in "square conflict" with Supreme Court precedent that is controlling as to law and fact or (b) if no such controlling decision exists, "the state court's resolution of a question of pure law rests upon an objectively unreasonable deprivation of legal principles from the relevant Supreme Court precedents, or if its decision rests upon an objectively unreasonable application of established principles to new facts"... "In other words, habeas relief is authorized only when the state courts have decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable."

*Williams v. Taylor*, 163 F.3d 860, 865 (4th Cir.1998), cert. granted, 526 U.S. 1050, 119 S.Ct. 1355, 143 L.Ed.2d 516 (1999), quoting *Green v. French*, 143 F.3d 865, 870 (4th Cir. 1998) (internal citations omitted).

proach was "unreasonable." *Smalls v. Batista,* 6 F.Supp.2d 211, 219 (S.D.N.Y.1998). Judge Sweet found that "the charge was coercive and failed to include cautionary language counseling jurors not to surrender their conscientiously held beliefs, and the Appellate Division unreasonably found—given federal law as determined by the United State Supreme Court—the Allen charge to be proper." *Id.*[9]

The Second Circuit affirmed, concluding that the trial court's charge was "unconstitutionally coercive" because it "obligated jurors to convince one another that one view was superior to another" and "failed to remind those jurors not to relinquish their own conscientiously held beliefs." *Smalls,* 191 F.3d at 278. The Second Circuit determined that "the state court judgment in this case was both 'contrary to [and] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Id.* The Court reviewed the trial judge's decision *de novo* in order to determine whether, under Section 2254(d)(1), it was "contrary to" clearly established federal law. The Court also reviewed the trial court's determination under the (more deferential) "unreasonable application of" standard—and arrived at the same conclusion. *Id.* The Second Circuit has "yet to determine under what circumstances a state court decision is reviewed de novo to determine whether it is 'contrary to' clearly established federal law, instead of being reviewed under the more deferential 'reasonable application of' standard." *Id.* It has declined to "join either side of the existing circuit split on this issue." *Id.*

Following the lead of the Circuit Court in *Smalls,* this Court has conducted a de novo review and has determined that the trial court's decision was correct. It was neither "contrary to" nor an "unreasonable application of" Federal law.[10] The trial court's decision also was not "based on an unreasonable determination of the facts in light of the evidence" under 28 U.S.C. § 2254(d)(2).

### Supreme Court Precedent

As noted, Petitioner Davis argues that the trial judge's refusal to charge justification (self-defense) deprived him of his right to due process as secured by the Fourteenth Amendment to the United States Constitution. The Supreme Court has held that "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988) (citing *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896)). In *Stevenson v. United States,* the trial judge had instructed the jury with respect to self-defense to a murder charge but refused to charge the jury with respect to the lesser crime of manslaughter. The Supreme Court held, "So long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine." *Stevenson,* 162 U.S. at 314, 16 S.Ct. 839. The Court continued, "There must, of course, be some evidence which tends to bear upon that issue. The jury would not be

---

**9.** Judge Sweet reviewed the state court decisions under the "unreasonable application of" standard. *Id.*

**10.** Since factual analysis impacted the trial judge's determinations here, it could readily be argued that "greater deference" (should) be given to the trial court's decision. 28

U.S.C. § 2254(e)(1) states that "a determination of a factual issue made by a State court shall be presumed to be correct" and that Petitioner is required to rebut this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

justified in finding a verdict of manslaughter if there were no evidence upon which to base such a finding, and in that event the court would have the right to instruct the jury to that effect." *Stevenson,* 162 U.S. at 315, 16 S.Ct. 839.[11]

■ At the same time, due process does not require that a defendant receive a particular jury instruction when such charge is not supported by the evidence. *See Beck v. Alabama,* 447 U.S. 625, 635–36, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Blazic v. Henderson,* 900 F.2d 534, 541 (2d Cir.1990). *See also Holt v. Deere & Co.,* 24 F.3d 1289, 1295 (10th Cir.1994).

■ In the case at bar, this Court has (after de novo review) determined the trial judge's decision not to include a self-defense charge in the jury instructions was not "contrary to" federal precedent.[12] The trial judge concluded that Petitioner Davis did not present "sufficient evidence" of self-defense to warrant a jury charge of justification. She informed counsel that she did "not intend to charge justification because [she did] not believe the record supported a justification charge." (Colloquy, Tr2. at 291.) This Court agrees. The trial court found that Davis had a duty

to retreat when he (first) encountered Bubblegum on June 20, 1992 since, as he testified, he was afraid of Bubblegum a soon as he saw him. He never fulfilled that duty either temporally or substantively—rather he immediately got a gun, sought and (re)encountered his "nemesis," and shot Bubblegum five times in the back.[13] He became the aggressor.

### Justification Under New York Law

■ Judge Peck correctly concludes that Davis "was not entitled to a justification jury charge under New York Law since he could have retreated from imminent harm with complete safety." (Report at 404.) New York Penal Law § 35.15 provides that a person is justified in using physical force under the following circumstances:

1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical

11. *Mathews v. United States* involved the failure of the trial judge to charge the jury with mutually exclusive theories of defense. The defendant sought both to deny committing the offense (of accepting a bribe in exchange for an official act) and to rely on the affirmative defense of entrapment. *Mathews,* 485 U.S. at 61–62, 108 S.Ct. 883. Before *Mathews,* there was no criminal procedure counterpart to Rule 8(e)(2) of the Federal Rules of Civil Procedure which expressly allows for inconsistency (alternatives) in civil pleadings. *Id.* at 64–65, 108 S.Ct. 883. Faced with Matthews' alternative defense theories, the Supreme Court remanded the case and held that countenancing inconsistency in criminal cases does not necessarily encourage perjury. *Id.* at 65, 108 S.Ct. 883. "Here petitioner wished to testify that he had no intent to commit the crime, and have his attorney ar-

gue to the jury that if it concluded otherwise, then it should consider whether that intent was the result of Government inducement." *Id.*

12. The trial court's determination also did not involve an "unreasonable application of" Federal law which, as noted, is a somewhat lesser (i.e. more deferential) standard. *See Smalls,* 191 F.3d 272; *Matteo,* 171 F.3d 877; *O'Brien,* 145 F.3d 16; *Drinkard,* 97 F.3d 751.

13. The Appellate Division found that Davis was not in danger of deadly physical force at the time he shot Bubblegum and that Davis did not offer a "convincing reason as to why he did not retreat from the scene at the time of the actual shooting." *Davis,* 648 N.Y.S.2d at 80.

force by such other person, unless:
. . ..

    (b) The actor was the initial aggressor; . . .

2.  A person may not use deadly physical force upon another person under circumstances specified in subdivision one unless:

    (a) He reasonably believes that such other person is using or about to use deadly physical force. *Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of doing so by retreating;* . . .

New York Penal Law § 35.15 (emphasis added). New York has one of the strictest duty to retreat requirements. *See, e.g.,* 35 N.Y. Jur.2d *Defenses to Criminal Liability* § 3484 (1995). A defendant is not entitled to claim self-defense if he fails to retreat (and he can safely do so) once the duty to retreat arises. *See, e.g., In re Y.K.,* 87 N.Y.2d 430, 434, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996) ("If a defendant confronted with deadly physical force knows retreat can be made with complete safety and fails to do so, the defense is lost").

The trial court, in deciding not to charge justification, focused upon Davis' duty to retreat following the first encounter with Bubblegum on June 20, 1992. *See supra,* p. 382 (quoting Colloquy, Tr2., at 295). *See also* Report at 401–02, 408. Referring to Davis' failure to fulfill that duty, the trial court concluded that Davis' actions, as a matter of law, did not warrant a charge on self-defense. *See supra,* at 382. Stated in other terms, Davis "went away" (i.e.

retreated) from Bubblegum because he was deathly afraid of Bubblegum—and "should have stayed away." (Report at 400–402 (quoting Colloquy, Tr2. at 291, 295, 311–15).)

The Magistrate Judge also (correctly) concluded that since Davis did not (completely) retreat when he had the opportunity to do so safely, he relinquished his right to a jury charge of self-defense. (Report at 412.) In reaching his conclusion, Magistrate Peck agreed with the trial court.[14]

. . . [I]f there was any truth to petitioner's claim that he had subjectively feared the use of deadly physical force by Leonard [Bubblegum], that fear would necessarily have been aroused when petitioner first saw Leonard on the street, before petitioner got the gun . . . [I]f petitioner was right about Leonard presenting a deadly threat, that threat must have been ongoing.

. . . Leonard can hardly have offered so little threat to petitioner before the shooting that petitioner had no duty to retreat from his presence at that time, but so great a threat when he added a hand motion to whatever he had been doing before then that petitioner was entitled to kill him . . . Having purportedly been aware of his danger, petitioner armed himself and deliberately placed himself in close proximity to the source of that danger when there was clearly no need to do so. If it was true that petitioner believed Leonard was armed and intended to kill him, he did not have to wait for the final, overt consummation of that intent to realize he should retreat. Thus, the court correctly denied

---

14. At the same time, Magistrate Peck determined that, contrary to the Appellate Division's ruling, a juror could reasonably have

believed that Bubblegum was in imminent deadly harm during the second encounter as well. (Report at 408–409.)

his request for a charge on justification.[15]

(State Br. at 46–47, record citations omitted & emphasis added.) Since Davis had the opportunity to retreat safely after his first encounter with Bubblegum on June 20, 1992, and, in fact, did safely retreat, the Magistrate Judge concluded that the trial judge "correctly applied New York law to the facts as she found them." (Report at 413.) **This Court agrees and believes that Davis became the "initial aggressor" by obtaining a gun, coming back to confront Bubblegum, and shooting Bubblegum in the back.**

The trial court's refusal to charge justification is clearly consonant with New York case law. Indeed, the New York courts have refused to charge self-defense on facts far more compelling than those in the case at bar. In *People v. Rattley*, 148 A.D.2d 642, 539 N.Y.S.2d 101 (1989), for example, the Court held:

> [T]he evidence established that the defendant and his brother argued loudly and violently and that the defendant's brother, brandishing a knife, told [the defendant] to get out of his room. The defendant returned to his own room and after remaining there for a short time, took his gun and returned to the scene of the prior fight. When his brother screamed at him and came at him with the knife in his hand, the defendant shot him twice, killing him...**We find that the evidence clearly establishes that in the second confrontation, which**

**ended in the death of the defendant's brother, the defendant was the initial aggressor.**

539 N.Y.S.2d at 101 (emphasis added).

Similarly, in *People v. Mungin*, 106 A.D.2d 519, 483 N.Y.S.2d 54 (1984) the Court stated:

> The evidence established that following the first altercation between the parties, the defendant went to a friend's house, obtained a shotgun and shells, returned to the scene and sought out the decedent. Even assuming that the decedent did grab for his knife when the defendant approached him with the shotgun in hand, the defendant concededly had the ability to withdraw and retreat from the encounter but instead chose to resort to more than necessary force to allegedly defend himself. In view of these facts, the defense of justification was not available to the defendant as a matter of law.

483 N.Y.S.2d at 55.

And, in *People v. Snell*, 256 A.D.2d 480, 682 N.Y.S.2d 80 (1998), the Court held that "[c]ontrary to the defendant's contention, the People adduced legally sufficient evidence to prove that the defendant was able to retreat safely, but instead chose to return with a loaded firearm and retaliate by shooting the victim. This evidence negated the essential elements of the justification defense." *Id.*, 682 N.Y.S.2d at 80–81 (internal citations omitted).[16]

---

**15.** The State also argued:

> Petitioner's own testimony confirmed that his purported fear was premised not on what Leonard was doing when petitioner shot him, but on their previous experiences. The whole thrust of petitioner's claim at trial was not that he had killed Leonard because he had seen him turn around, or even because he had seen him move his hand, but because of what had gone on

before, which had made him fear Leonard at all times and whatever he was doing. (State Br. at 47–48, record citations & emphasis added.)

**16.** *See also Connecticut v. Lewis*, 220 Conn. 602, 600 A.2d 1330, 1339–1340 (1991) ("The only evidence that the defendant claims was relevant to the defense of justification was adduced through Ortiz. Ortiz testified that, in response to questioning, the defendant stat-

Here, by not retreating after the first encounter with Bubblegum on June 20, Davis became the "initial aggressor" in the fatal encounter with Bubblegum. *See People v. Rattley supra.* The justification defense is not available to him as a matter of Federal (or state) law—as Judge Peck and (with respect to state law) the trial judge concluded. *See* Penal Law § 35.15. (*See also* Report at 413). Davis was not entitled to a jury charge of justification because by not staying (safely) away when he

ed that he was afraid of the victim and that he killed the victim 'because if he had not [the victim] would have somehow killed him.' Ortiz also stated that the defendant appeared to believe that the victim was a dangerous drug dealer, and appeared genuinely to fear the victim. That evidence, if credited, would have allowed the jury to believe that the defendant feared for his life. It would not, however, have allowed them to find that at the time he killed the victim, it was reasonable for him to believe that the victim was about to use deadly physical force or inflict great bodily harm and that it was necessary to kill the victim to prevent such conduct. **Even viewed in the light most favorable to the defendant, this evidence would not support a claim of legal justification under § 53a–19. The defense of self-defense does not encompass a preemptive strike.**") (emphasis added).

17. Petitioner here claims: "Davis would lose his claim to a justification defense only if, at the point when he first saw Bubblegum on the street before he retrieved the gun, the *only* reasonable view of the evidence was that the use of deadly physical force by Bubblegum was imminent." (Objections at 32.) The trial judge, who heard all the testimony, appears to be in agreement with this assessment. (Colloquy, Tr2. at 311–315 ("Davis would have us believe....that he was deathly afraid of the deceased...that he had a good reason to be deathly afraid of the deceased"; "...if the defendant has a duty to retreat [from the first encounter] and I submit he does and successfully retreats as I maintain he does, can he thereafter invoke a defense by putting himself back in the same position with the gun at the ready?").) The Appellate Division (similarly) determined that "defendant did not explain why that final encounter posed a threat of deadly physical force when their previous ex-

had the chance, Davis did not fulfill his duty to retreat. He was not "justified" in shooting Bubblegum in the back. (Report at 413.) [17]

The evidence here did not, as a matter of law, warrant a justification charge. *See People v. Counts*, 214 A.D.2d 897, 625 N.Y.S.2d 697, 698 (1995). *Accord, e.g., People v. Watts*, 86 A.D.2d 964, 448 N.Y.S.2d 299, 300 (1982). The jury instructions were not erroneous and, thus,

changes of glances minutes earlier did not." *People v. Davis*, 648 N.Y.S.2d at 80. Thus, even under the standard espoused by Petitioner, the trial judge was not required to instruct the jury on self-defense.

The cases Petitioner cites do not warrant or compel a different result. In *In re Y.K.*, 87 N.Y.2d 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996), for example, the defendant, unlike Davis here, did not secure a deadly weapon and then return to the scene of the initial encounter. Instead, the defendant in *In re Y.K.* noticed a knife on the sidewalk as she walked away from a threatening group of fellow students. When the group attacked her again, and after five to eight minutes of continuous beating, the defendant, while pinned on the ground, used the knife she had found to stab one of her attackers. The defendant in *In re Y.K.*, was not the initial aggressor.

Similarly, the defendant in *People v. Magliato*, 68 N.Y.2d 24, 505 N.Y.S.2d 836, 496 N.E.2d 856 (1986), did not seek out his victim after arming himself. Magliato passed by the decedent en route to a police station to report an earlier incident. Seeing the victim's parked car, Magliato stopped to call the police from a telephone booth. The decedent started towards Magliato with a club, at which point Magliato drew his gun.

*People v. McManus*, 67 N.Y.2d 541, 505 N.Y.S.2d 43, 496 N.E.2d 202 (1986), involved defense of a third person. There, the defendant was entitled to a justification defense because "the evidence was sufficient to support a jury finding that defendant reasonably believed his actions were necessary to protect his companion from the use of deadly force and robbery." 67 N.Y.2d at 549, 505 N.Y.S.2d 43, 496 N.E.2d 202.

they neither "removed a factual question critical to guilt or innocence from the jury's consideration and effectively directed a verdict" nor "so infected the trial as to violate due process." (Davis Br. at 40.)

The trial judge, as Judge Peck concluded, did not violate Davis' due process rights. *See Blazic v. Henderson*, 900 F.2d at 541. This Court cannot conclude that the trial court's decision was "contrary to" (or an "unreasonable application of") Supreme Court precedent. Federal law only requires a jury charge be given where sufficient evidence is presented at trial, and the evidence here did not support a justification charge. The trial judge acted in accordance with Supreme Court precedent, and, therefore, the standards for obtaining habeas relief under Section 2254(d) are not met.

## CONCLUSION

For the reasons stated herein, the Court adopts Magistrate Judge Peck's Report to the extent that it concludes that Petitioner's request for a writ of habeas corpus should be denied. The Clerk is respectfully requested to dismiss the case with prejudice.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Petitioner Ronald Davis admitted that he fatally shot Eddie Ray Leonard, also known as "Bubblegum," in the back, and was convicted of manslaughter and criminal possession of a weapon, and sentenced to seven to twenty-one years imprisonment. Davis's habeas corpus petition, filed by the Legal Aid Society on his behalf, argues that his conviction violated his due process rights under the Fourteenth Amendment because the trial court re-

fused to charge the jury with the defense of justification. (Pet.¶ 12(A); *see also* Davis Br. at 33–73; Davis Reply Br. at 6–16.) Bubblegum had robbed Davis three prior times, and on the most recent, said that he would kill Davis when he next saw him. The next time that their paths crossed, Davis left, got a gun and returned to where Bubblegum was standing; Davis then shot Bubblegum in the back when Bubblegum reached toward his waist. The state courts held that the justification defense was not available because Davis should have retreated before using deadly force, instead of getting a gun and laying in wait for Bubblegum.

For the reasons set forth below, I recommend that the Court deny Davis' habeas corpus petition on the merits.

### FACTS

#### The Trial Evidence

At trial Davis testified that he shot Bubblegum. (*E.g.*, Davis, Tr2. at 67.)[1] Davis had known Bubblegum all his life, although he tried to avoid him. (*Id.* at 33–34.) Bubblegum was "a bad guy, a stick up kid, robbing people" (*id.* at 34), and when Davis saw Bubblegum, "[b]ecause I know that he is a stick up kid. I didn't want to have no problem, so I go the other way." (*Id.*)

#### Bubblegum's Prior Armed Robbery and Rape of Davis

Bubblegum robbed Davis at gun point three times prior to the shooting, and raped him once. Bubblegum first robbed Davis and his friend Gregory Pearce, when Davis was "about 15 or 16" (*id.* at 34–35, 74–75):

---

1. Citations to "Tr1." refer to the trial transcripts of the first week of trial, from 5/16/94 through 5/20/94, and citations to "Tr2." refer to the trial transcripts of the second week of trial, from 5/23/94 through 5/26/94.

I was running the numbers and I got to 146th Street, I seen a friend named Gregory, I was talking to him. Then this guy named CC [who Davis knew] comes up to him. Then . . . CC come up to me. He is asking me questions that I couldn't answer. He kept talking to me. He pulled out the gun and made me go into the hallway. . . . After he forced me into the building, we got to look in the building, then I see Bubblegum picked up groceries and carried [them] into the building. . . . Then they made us go upstairs. . . . They had the guns to us. . . . Both of them had a gun. . . . [When we got upstairs] [t]hey went and took—they went in our pocket took the money we had and made us strip. . . . They said "Take off your clothes." . . . CC had the gun on me. . . . [Bubblegum's gun was pointed] at Gregory. [Davis and Gregory took their clothes off and put them] [o]n the floor, then [CC and Bubblegum] kicked them. . . . They kept demanding more money. They thought I had more money but I didn't have any more. Bubblegum said I was lying. He told CC to shoot us. . . . [CC] said, "We got the money, why shoot him?" Then they was arguing. Then they left down the stairs. (*Id.* at 35–38; *see also id.* at 84–86; Pearce, Tr2. at 280–82, 286–89.) Neither Davis nor Pearce reported this incident to the police. (Davis, Tr2. at 40, 77–79; Pearce, Tr2. at 284.)

Bubblegum robbed Davis again two or three years later when Davis was "about 18." (Davis, Tr2. at 38.) Davis was "alone" on "147th Street and Saint Nicholas" having "just walked over from [his] friends" who "were on 146th and Saint Nicholas." (*Id.*) "It was just getting dark" and "as soon as [Davis] turned the corner on 147th Street, Bubblegum was there. . . . [Bubblegum] grabbed [Davis] by [the] shirt and said, 'Come here, come here,

little bitch.' He had a gun out. He went in [Davis'] pocket. . . . [Bubblegum was pointing the gun] towards [Davis'] chest. . . . He took the money [Davis] had in [his] pocket. . . . After [Bubblegum] took the money . . . [h]e told [Davis] [']to get the fuck out of here.['] . . . [Davis] left." (*Id.* at 39–40.) This time Bubblegum did not force Davis into a building, but robbed him on the street. (*Id.* at 39–40.) Davis did not report this second incident to the police "[b]ecause [Davis] was getting [his] money from numbers. They wouldn't have done nothing about it. And plus, that is snitching." (*Id.* at 40; *see also id.* at 79–82.) Davis also said he was scared to report the incidents. (*Id.* at 40, 79–82.)

After the second robbery, Davis hid from Bubblegum. (*Id.* at 40.) Then Bubblegum was imprisoned for robbery and Davis did not see Bubblegum for a while. (*Id.* at 41.)

Davis also was aware of violent acts that Bubblegum had committed against others. (*Id.* at 41–42.) Davis knew that Bubblegum "beat a lady with a chain and robbed her. And there was an old lady and old man he had robbed and he had stabbed the old man. He had robbed the [drug] dealers that were on the street . . . [and] there were two guys he robbed. They had their girlfriend with him. He had tied him up and raped the girl. He had beaten somebody up bad around his block and he had to go to the hospital. He robbed and raped a lady in his building." (*Id.* at 41–42.) Davis said that Bubblegum had a reputation for being "a bad guy. . . . Everybody knows him as a stick up kid, he is dangerous." (*Id.* at 42–43.) Davis said he knew that Bubblegum used PCP "[d]ust, cocaine and dope." (*Id.* at 43.) Davis said that when Bubblegum was on drugs he "would get wild and violent and go on his

missions ... sticking people up in the neighborhood." (*Id.* at 43–44.) [2]

Three to four weeks before Davis shot Bubblegum, Bubblegum again robbed and raped Davis at gun point:

> I was on 146th Street, 518, where I usually take the numbers. I was hanging out there, drinking coffee and I had a danish. It was early in the morning.... A tall guy comes up to me and he is asking me about drugs. Did I know where to get them from. I was telling him no, I don't know. You know what I am saying.... I didn't know that person.... He kept talking to me; I was trying to walk away from him and ignore him because once I told him, no, he still kept talking to me. Then he pulled out the gun and pushed me in the hallway. When I got to the back of the hallway that is when Bubblegum came in.... [Bubblegum] said, ["T]ake him upstairs.["] Bubblegum had a gun.... The other guy had the gun to my back. They both led me upstairs .... [t]o the top landing of the building. When it is the top landing, as soon as you step outside the door, you're outside on the roof.... They went into my pocket.... He was going through my pocket. [Bubblegum] said[,] "I know you got more money." I didn't have any more money. He made me strip. He figured I had some money in my drawers.... [Bubblegum] kicked [Davis' clothes] into the corner.... Then he sent the guy downstairs, told him to go watch out....
>
> When he left, Bubblegum hit me in my head with the gun.... After he hit me in my head I bent down. He took my head and slammed it into the wall.... That is when he did what he did to me.... That is when he raped me.... He stuck his penis in me ... I was bent down. I told you he held me against the wall.... I kept screaming, telling him "stop." I was in pain.... He said, "Shut the fuck up." He said he would treat me like one of the bitches. [Davis said he did not know how long the attack lasted, but it stopped] because somebody had opened the door downstairs and they had closed it.... I heard the door open and I heard it close. I started screaming even more, figuring somebody would come out.... I was saying "please stop." [Bubblegum was saying] ["]Shut the fuck up before I kill you.["] ... [At that point] I didn't see the gun. I told you he had me down.... After he stopped he hit me again. I was on the floor. Then he was zipping up his pants. *Then he tells me, next time he sees me he is going to kill me*.... Then he left....

(Davis, Tr2. at 44–52; emphasis added.)

Davis explained that did not report the rape because "it bothers me to talk about it that I know what he did to me. I never told nobody, my mother, nobody. That is why they are not here now. I asked them not to come." (*Id.* at 52–53, 87, 167, 190.) The first people Davis told about the rape was the prosecutor and defense counsel, in the prosecutor's office, after defense counsel said that Davis "was going to trial [and he] had to tell the truth. [He] had to tell them what happened." (*Id.* at 168–69.)

### The Events of June 20, 1992

After the rape/robbery, Davis went to Maryland. (*Id.* at 54.) Davis returned to

---

**2.** James Bluitt, who lived in Bubblegum's building, testified that Bubblegum had broken a stick over his head and assaulted him, putting Bluitt in the hospital. (Bluitt, Tr2. at 213, 218–19.) Bluitt subsequently went to the police and got two orders of protection against Bubblegum. (*Id.*) Bluitt said Bubblegum had a reputation in the community for being vicious and violent, and for carrying a gun, although Bluitt never saw Bubblegum with a gun. (*Id.* at 218, 220–21, 223.)

New York on June 19, 1992, so that he could be with his family on his birthday on June 21. (*Id.* at 54–55.)

On June 20, 1992, after running numbers in the morning, at 9:00 p.m. Davis came out of a grocery store on the corner of 146th Street and stood with his friend "Little Will." (*Id.* at 55, 95–99.) Davis "looked over" and saw Bubblegum. (*Id.* at 55–56, 96.) Davis made eye contact with Bubblegum, and Bubblegum looked in his direction while talking to "another guy" with whom Bubblegum was standing, two cars down. (*Id.* at 56–57, 101–02.) Ellen Symonette testified that Bubblegum had just come out of a drug spot with eyes that were "bugging out" and "sweating real like popping out real sweats" and looked "nervous." (Symonette, Trl. at 485–87, 501.) [3]

Davis was afraid of Bubblegum as soon as he saw him. (Davis, Tr2. at 103.) Davis went around the corner to "get a gun" from a man named Red at "the spot," the place where Davis took the numbers he ran and where drugs were dealt. (*Id.* at 57–58, 102–03.) Davis looked to see if Bubblegum was following him, but he was not. (*Id.* at 103–06.) In "the spot," Davis told Red that "the guy who robbed [him] was downstairs," and Red gave him a chrome plated .38 revolver. (*Id.* at 58, 110.) Davis checked that the gun was loaded. (*Id.* at 110–11.) Davis got the gun, "Because last time [Bubblegum] left [Davis] he told [Davis] he was going to kill [Davis]." (*Id.* at 58.) Davis did not intend to kill Bubblegum, but he "wasn't going to let [Bubblegum] hurt [him] again." (*Id.* at 59, 111.)

When Davis came out of the building with the gun, he did not see Bubblegum (*id.* at 112) and admitted that he could have left the area or stayed at "the spot," but did not because he "wasn't thinking right." (*Id.* at 59, 107, 112–14.) "All [Davis] was thinking about was the last time [Bubblegum] raped [him]." (*Id.* at 107.) Instead, Davis went back out onto the street and looked at the place where Bubblegum previously stood. (*Id.* at 58–59, 113–14.) At first, Davis saw the man with whom Bubblegum had been standing, but did not see Bubblegum. (*Id.* at 58–59.) Davis testified as follows:

Q. *Ronald when you got the gun, why didn't you just leave the area?*

A. *I don't know. I wasn't thinking right.*

Q. You have to keep your voice up.

A. *I don't know; I wasn't thinking right. I just got the gun for my protection. I wasn't going to let him hurt me again.*

  *   *   *   *   *   *

Q. . . . [W]hen you got off the block and turned the corner instead of keeping on going instead of going on, you went and you got a gun; is that right?

A. Yes, I did.

Q. Bubblegum didn't follow you around the corner, did he?

A. No, he didn't.

. . . .

Q. And Bubblegum didn't come after you; is that right?

---

3. Dr. Jonathan Hayes, an associate medical examiner, testified that when Bubblegum died he had various drugs in his system, including "a fair amount of phencyclidine" (PCP), a "[t]iny amount of methadone," opiates, cannabinoids, codeine and morphine. (Hayes, Trl. at 614, 631–35.) Dr. Hayes said, however- er, that "[t]he only intoxication which [Bubblegum] was experiencing at the time of his death was intoxication by phencyclidine." (*Id.* at 633–34.) Dr. Hayes acknowledged that PCP can produce a violent reaction, and a person under the influence of PCP is often violent. (*Id.* at 635.)

A. No, at that time he didn't.

\*     \*     \*     \*     \*     \*

Q. At that point you went into the building, right?

A. Yes, I did.

Q. With the intention of getting that gun; is that right?

A. Yes.

Q. You could have stayed in the building, couldn't you?

A. I went to somebody's house, I got the gun and I left.

. . . .

Q. What you're testifying to is, you walk into this apartment, tell the person by the name of Red, that the guy who robbed me is outside and they wouldn't let you stay there?

A. *Like I said, I wasn't thinking straight.*

*I went and got the gun. All I was thinking about was the last time he raped me.*

\*     \*     \*     \*     \*     \*

Q. So when you went back downstairs and saw Bubblegum you would be able to shoot him; isn't that correct? . . . .

A. I wasn't going to use the gun unless he tried to hurt me.

Q. *But you Mr. Davis, put yourself in that position by going back downstairs, did you not?*

A. *I did go back downstairs* . . . .

Q. When you came down out of that building, you did not take a left to go to Broadway [away from Bubblegum], did you?

A. I told you I went back up to Amsterdam.

Q. You took a right and went right back up to the place where you last saw Bubblegum; is that correct?

A. Yes.

. . . .

Q. Mr. Davis, the question I am asking you, when you came out of the building and are standing on the sidewalk of 146th Street between Amsterdam and Broadway, looked right, you could not see [Bubblegum], correct?

A. I could not see him . . . .

Q. *At that point you could have taken a left hand turn and continued on your way, is that not correct?* . . . .

A. *I said I wasn't thinking right.*

Q. But Mr. Davis you were thinking right enough to take that gun and hide it in your pocket?

A. Yes, I was.

Q. So Bubblegum when you went back to him would not know you had a gun in your pocket; isn't that correct?

A. Yes.

Q. *So basically when you went up to the corner you were going to lay in wait for Bubblegum to see what he would do to you; is that right?*

A. *Yes, I did.*

(*Id.* at 59, 103, 105–07, 111–13, emphasis added.)

Meanwhile, Symonette had stopped Bubblegum when he came out of the drug spot and "asked him [if he] want[ed] to buy a phone." (Symonette, Tr1. at 487.) Bubblegum called his wife from a phone booth about buying the phone. (*Id.* at 488–89, 503–04, 516–18.) Symonette heard someone call out to Bubblegum, and told Bubblegum to take care of his business. (*Id.* at 489.) After Bubblegum spoke to someone, he called Symonette back to him,

and he "looked kind of nervous like shook up about something." (*Id.* at 490, 520.) On direct examination, Symonette testified that Bubblegum said "['']there is something I have to take care of you know. I am going to take care of it and I still want the phone....[']" (*Id.* at 490.) On cross examination· by defense counsel, Symonette said that when she went back up to Bubblegum he looked agitated and when she said "what's wrong" he said he wanted the phone and just stood there. (*Id.* at 520.) Symonette also testified that Bubblegum said " 'I have to hit this guy off.' " (*Id.* at 506–07.) Bubblegum had a brown bag in his right hand and the telephone in his left. (*Id.* at 521–22.)

Davis spotted Bubblegum again at "the entrance of the school closer to 147th Street," up the block on the other side of the street. (Davis, Tr2. at 59, 62.) Davis walked "across the street and tried to ring [his] friend" Gregory Reid's doorbell "[t]o get out of the street to get away from [Bubblegum]," though geographically Davis was going toward the danger instead of away from it. (*Id.* at 60–61, 114–15.) No one answered Reid's bell, and Davis could not get into Reid's building without being buzzed in. (*Id.* at 61–64.)[4] Davis "[s]tepped down from off the building because [Bubblegum] was coming [his] way. [Davis] didn't want to get trapped in the hallway" of Reid's building. (*Id.* at 62.) Davis put his back against the wall. (*Id.* at 64.) Bubblegum "just stood there looking at him and [Davis] was looking at the guy across the street." (*Id.*) Bubblegum and Davis made eye contact. (*Id.* at 126.) At this point Bubblegum was about fifteen

to twenty feet away from Davis. (*Id.* at 124–25.)

Bubblegum started to walk toward Davis; Bubblegum was "looking at [Davis] but he was talking to [Symonette]. As [Bubblegum] got closer and closer he was looking, [Davis was] looking at him and the guy across the street—[Davis] was scared." (*Id.* at 65.) Davis said he did not run away, however, "[b]ecause [he] didn't want to turn [his] back. [Davis] didn't want to get shot in [his] back. [Bubblegum] told [Davis previously that] he was going to kill [Davis]." (*Id.* at 65–66.)

Bubblegum walked past Davis, turned, and reached to his left with his hand at his waist. (*Id.* at 65–66, 72–73, 139). Davis was on Bubblegum's left side. (*Id.* at 66.) Davis "thought [Bubblegum] was going to shoot [him]," although he did not see a gun on either Bubblegum or the other man. (*Id.* at 72–73, 132–33.) Davis said, however, that every time Bubblegum was around him he had a gun, and he thought Bubblegum had a gun then. (*Id.* at 73.) Davis ran behind Bubblegum to his right, so that Bubblegum would always have his back to him. (*Id.* at 67, 146–47, 191.) Davis said that at that point he was "stuck," he "panicked," and could not run away. (*Id.* at 141–44.)

Davis shot Bubblegum four or five times in the back. (*Id.* at 68; *see also* Hayes, Tr1. at 630, 636, 646 (Bubblegum had five bullets in his back).) As Bubblegum fell, wounded, Davis kept shooting. (Davis, Tr2. at 69.) Davis then ran down the hill, threw the gun away, and went home. (*Id.* at 69–71, 153.)

---

4.  Davis first mentioned that he tried to get into Reid's apartment at trial. (*Id.* at 118–20.) Davis said he did not mention it to the police or the prosecutor who videotaped his confession because he did not want to get another person involved, and he did not remember everything when the police were questioning him because they were asking "so many questions." (*Id.* at 185, 192–95.) Davis said his memory was better at trial than when he was questioned by the police. (*Id.* at 120, 195.)

On January 6, 1993, the police arrested Davis. (Sgt. Hollifield, Tr1. at 281–86; Detective Mooney, Tr1. at 586.) Detective Mooney "explained to [Davis] that [he] had the gun and that [he] had several eyewitnesses to the case and that [he] knew that [Davis] was the person who shot [Bubblegum]." (*Id.* at 587.) Detective Mooney advised Davis of his *Miranda* rights. (*Id.* at 587–92.) Initially, Davis said that he had not been present at the murder scene, but had been at a party. (*Id.* at 593–97; *see also* Davis, Tr2. at 71–72, 163–65.) Detective Mooney told Davis that his story was "absolutely not true." (Mooney, Tr1. at 598; Davis, Tr2. at 166.) In response Davis recanted, confessed to shooting Bubblegum, and gave a second statement, which he went over with Detective Mooney two or three more times, before Mooney wrote it down and Davis signed it. (Mooney, Tr1. at 601–03; Davis, Tr2. at 166–67.) At trial, Detective Mooney read Davis's confession into the record:

"I knew Bubblegum almost all my life since I have been in the street. When I was about 15 or 16 years old he robbed me and a friend of mine named Greg Pearce. *He put a gun to our heads,* made us strip butt naked and took all our money.

"A couple of years later when I was about 18 or 19 years old, I was by myself and Bubblegum grabbed me again. *He had a gun* and went into my pockets and took my money.

"About a month before Bubblegum was killed, he was with another guy. I don't know his name. They grabbed me on 146th Street by Amsterdam Avenue at the spot I used to be at, in parentheses 508 West 146th Street. They took me up to the roof. They made me strip butt naked and *Bubblegum was saying kill his ass about three times.* The other guy said we got the money, why should we kill him. Then Bubblegum said fuck that kill him. Kill him. Then the other guy didn't want to do it and said we got the money. Come on, man and the two of them left out the building arguing.

"After the last time he robbed, I saw him three or four times on the street but I kept hiding from him because I knew he was going to rob me again.

"On 6/20/92 I was hanging out in from of the store on 146th Street and Amsterdam Avenue near 508 West 146th Street. I saw Bubblegum walking on the same side of the street with a guy. He looked at me. There was a girl in his company but he was talking with the guy. The guy he was talking with stayed on the corner and Bubblegum and the girl walked up to 147th Street.

"I figured it was a set up because of the way it looked with the guy staying on the corner by me so I walked across the street. Then Bubblegum crossed over to the same side I was on at 147th Street and started to walk back towards me. He was looking at me. I was watching him and the other guy across the street. He kept looking sideways at me and then he stepped off the curb at 146th Street and he started to turn back toward me and I shot him.

"*I thought he was going to try to grab me again like he usually do. I thought he had a gun like he did all the other times.* I don't remember how many times I shot him because *I was scared. I was scared so I didn't wait to see if he had a gun. I just beat him to the draw.* I didn't give him a chance to say anything to me. I was too scared. I didn't see the other guy across the street with a gun either.

"After I shot, I ran down the hill toward Convent Avenue and I threw the gun down by where the garbage cans go in front of the building. Then I ran

home to my mother's house. I got the gun from the spot. All I know is it was a chrome 38."

(Mooney, Tr1. at 605–08.)

Davis consented to having his confession videotaped, and the tape was introduced into evidence and played for the jury. (*Id.* at 609–11, 652.) [5]

Professor Eileen Treacy, a graduate professor and consultant in sexual abuse, assault and child development, testified that rape victims frequently suffer from "rape trauma syndrome," and explained the syndrome.[6] (Treacy, Tr2. at 234.) The court ruled that Prof. Treacy's testimony was relevant to the defense of "extreme emotional disturbance" but not to a justification defense. (*Id.* at 231.)

### The Charge Conference and the Trial Court's Charge to the Jury

Prior to summation, the trial judge announced that she did "not intend to charge justification because [she did] not believe this record supports a justification charge." (Colloquy, Tr2. at 291; *see also id.* at 294–95.) The trial judge explained to defense counsel:

You know the duty to retreat is written. The case law is there. As I told the jurors, I do not make this stuff up as I go along.

It is very clear the defendant has a duty to retreat. The only case I have seen that would even remotely suggest that this defendant when he says he saw the deceased and went into a panic did not have a duty to retreat was the case I believe, that I know is a First Department case, I think it is *[People v.] Rivera*[, 138 A.D.2d 169, 530 N.Y.S.2d 802 (1st Dep't), *appeal denied*, 72 N.Y.2d 923, 532 N.Y.S.2d 857, 529 N.E.2d 188 (1988) ].

The critical difference between that case and this case however is that the record there supported a different scenario.

(*Id.* at 295.) During further colloquy about a justification defense charge, the trial judge summarized her understanding of the law:

First the defendant must establish that, one, he reasonably believed that there was about to be the imminent use of deadly physical force for which he should repel that force; and two, that he satisfied his duty to retreat or was under no such duty to retreat. *People v. Watts*[, 57 N.Y.2d 299, 456 N.Y.S.2d 677, 442 N.E.2d 1188 (1982) ].

(Colloquy, Tr2. at 301–02.) Defense counsel argued that "this is a factual question. This is not a legal question.... I would also strongly object to the Court charging the duty to retreat language." (*Id.* at 307.) Defense counsel argued that if, "after retreating and being safe, the defendant could encounter a situation where he was in danger, ... the court would then have to evaluate whether or not he was under an obligation and duty to retreat." (*Id.* at 310–11.) Defense counsel further

---

**5.** This Court was not provided with the videotaped confession. From the State's brief it appears that Davis' videotaped confession was more detailed than his written statement, and varied from the written confession in some respects. (*See* State Br. at 19–21.)

**6.** Prof. Treacy testified that she had never met Davis (*id.* at 245), but that there is a pattern of behavior in cases of adult sexual assault known as rape trauma syndrome, which effects both men and women. (*Id.* at 245–52, 272.) According to Prof. Treacy, a person who has been raped experiences fear of the offender, especially if a threat was made or a weapon used during the rape. (*Id.* at 254–56.) Prof. Treacy also said that only between 5 and 10% of rape victims report their rape, and men are less likely to report rape than women. (*Id.* at 252, 259–60.)

argued that the duty to retreat arises when there is the second encounter, but if defendant believes that he cannot retreat with complete safety there is no duty to retreat. (*Id.* at 308–09, 316.) The trial judge responded that she "was going to look at this in the light most favorable to the defendant" (*id.* at 311), and then proceeded to summarize for counsel her view of the evidence in the light most favorable to Davis:

> If true, if completely true *the defendant would have us believe the following: That he was deathly afraid of the deceased. Two, that he had good reason to be deathly afraid of the deceased.* Three, that on the date of this incident he was not at his home nor was he still at his place of business because he said he had finished doing his number running business for the day long before this incident occurred at nine o'clock at night, three; and so to infer from that he was there. He wanted to be there. I guess he likes this area even though he knows, he said, the person he most feared in the world lived in that area.
>
> *Four, that shortly before the shooting he saw the person he most feared and feelings of what could be described as sheer panic, overwhelmed him and he left the area.* While there may have been some staring ... there was no physical encounter. *The defendant walked away. That he walked down 146th Street towards Broadway and the only thing that prevented him from continuing down towards Broadway and going any place he wanted to go was his own choice to go get a gun to protect himself.*
>
> That he went into this apartment where he knew there was a gun, and he knew the people and told them that the person he was most fearful of who had robbed him was out on the block meaning Amsterdam Avenue and they gave— this I don't believe—they gave him a gun. I am sure he asked for that gun, but that's okay, but in any event he gets the gun.
>
> He doesn't sit there. He doesn't wait until dark, whatever. He just goes back out on the block. *He came back outside.* He looked up and down 146th Street to one avenue to the other. *He didn't see anybody and again instead of going away from the danger where he knows the danger is and frequents because he has had this encounter with him on* 146th Street and Amsterdam Avenue for at least three occasions, he walked towards Amsterdam Avenue.
>
> Now, my question and then when he gets to Amsterdam Avenue and 146th Street he sees the deceased a block away on 147th street, that he did not walk back to where he knew was a safe avenue because he had just come from there and he knew those people were home but rather—and this is the first time we heard anything about this at trial—he walked across the street to a building he couldn't get in because he knew the door would be locked and could only get in if someone answered the door and no one answered it, *so my question is very simple.* Is the defendant—is there evidence that one could rationally conclude that the defendant's actions were those of a reasonable man acting in self-defense who has a duty to retreat? *That is, if the defendant has a duty to retreat and I submit he does and successfully retreats as I maintain he does, can he thereafter invoke self-defense by putting himself back in the same position with the gun at the ready?*
>
> *That's my question to you, because I think that's the synopsis of what this defendant said what happened. He got away. He went and got his gun. In-*

*stead of continuing to get away, he went back to where Bubblegum was minutes before; and can the defendant then— can the first effort, the first clear opportunity to retreat with complete safety be ignored?*

(*Id.* at 311–15, emphasis added.)

The next morning, the trial judge told counsel that she "would not charge justification" (*id.* at 345, 358, 360), but charged the affirmative defense of extreme emotional disturbance (*e.g., id.* at 478). The trial judge said that she would issue a further written opinion (*id.* at 358), but apparently did not do so. (*See* Davis Br. at 30 n. 14.) Defense counsel took exception to the ruling. (*Id.* at 345–46, 356, 358–59, 504.)

### Verdict and Sentence

The jury found Davis not guilty of murder in the second degree, but guilty of manslaughter in the first degree and guilty of criminal possession of a weapon in the second degree. (*Id.* at 540–45.)

On September 8, 1994, Davis was sentenced to concurrent prison terms of seven to twenty-one years on the manslaughter count and five to fifteen years on the weapons count. (Sent. Tr. at 18–19; *see also* Pet ¶¶ 1–4.)

### Davis's Direct Appeal

Davis appealed to the First Department, challenging his conviction on the sole ground that the trial court's refusal to give the justification charge "deprived [Davis] of his due process right to a fair trial," citing the Fourteenth Amendment of the U.S. Constitution and the New York Constitution. (Davis Appendix: Davis 1st Dep't Br. at 36, 48.)

On October 8, 1996, the First Department affirmed Davis' conviction. *People v. Davis*, 232 A.D.2d 209, 648 N.Y.S.2d 79 (1st Dep't 1996). The First Department's decision reads, in full:

The trial court properly declined to charge the jury on the defense of justification since there was no objective view of the evidence that would support a finding that defendant's belief that the victim was using or about to use deadly physical force was reasonable ... at the time defendant fatally shot the victim. Although defendant testified that the victim reached toward his waist immediately before the shooting, defendant acknowledged that he did not see any weapon on the victim's person and that he did not give the victim a chance to turn around before repeatedly shooting him in the back. Defendant claimed that the victim kept looking at him right before the shooting and that defendant feared that the victim would again attack him as in the past. However, defendant did not explain why that final encounter posed a threat of deadly physical force when their previous exchanges of glances minutes earlier did not. Finally, we note that defendant offered no convincing reason as to why he did not retreat from the scene at the time of the actual shooting.

*Id.* at 209, 648 N.Y.S.2d at 80. The Court of Appeals denied leave to appeal on December 31, 1996. *People v. Davis*, 89 N.Y.2d 921, 654 N.Y.S.2d 723, 677 N.E.2d 295 (1996).

### Davis's Federal Habeas Petition

The Legal Aid Society continued its representation of Davis by timely filing the present federal habeas corpus petition on or about July 11, 1997. The petition raises a single ground: the "[t]rial court's refusal to instruct the jury on the defense of justification deprived petitioner [Davis] of his due process right to a fair trial. U.S. Const. Amend. XIV." (Pet.¶ 12(A); *see also* Davis Br. at 33–73; Davis Reply Br. at 6–11, 14–16.)

The state has opposed the petition on procedural grounds, claiming that Davis did not present this issue in federal terms before the state courts and thus has forfeited habeas review. (State Br. at 35–41.) The State also argues that the trial court's decision was correct on the merits. (*Id.* at 41–56.)

## ANALYSIS

### I. DAVIS IS NOT PROCEDURALLY BARRED FROM RAISING THE DUE PROCESS CLAIM IN FEDERAL COURT

The State claims that Davis is procedurally barred from raising his constitutional due process claim because at trial Davis only raised state statutory/case law grounds and did not raise a constitutional objection. (State Br. at 36.) The State also claims that although Davis stated in his First Department brief that he was denied a fair trial in violation of due process under the 14th Amendment, this statement was conclusory since the rest of the brief was devoted to New York law, and "there is no reason to suppose that state [appellate] courts ... were aware that petitioner was presenting any constitutional claim on appeal." (State Br. at 36 n. *.)

In fact, before the First Department, Davis's constitutional argument was printed in bold face:

### ARGUMENT

**THE COURT'S REFUSAL TO CHARGE JUSTIFICATION, WHICH WAS BASED ON ITS ERRONEOUS LEGAL CONCLUSION THAT A DEFENDANT'S DUTY TO RETREAT ARISES WHEN THE POTENTIAL AGGRESSOR FIRST APPEARS RATHER THAN WHEN THE DEFENDANT REASONABLY BELIEVES THAT THE AGGRESSOR IS ABOUT TO EMPLOY DEADLY PHYSICAL FORCE, DEPRIVED APPELLANT OF HIS *DUE PROCESS RIGHT TO A FAIR TRIAL.* U.S. CONST., AMEND. XIV; (N.Y. CONST., ART. I, § 6.)**

(Davis Appendix: Davis 1st Dep't Br. at 36, emphasis added; *see also id.* at 37, 48.) To suggest that the First Department did not read this bold-type heading to Davis's argument is, at best, speculation.

Davis's reference before the First Department to due process and the Fourteenth Amendment sufficiently raised the federal constitutional nature of Davis's claim, so this claim is exhausted and ripe for habeas review on the merits. *See, e.g., Jones v. Vacco,* 126 F.3d 408, 413–14 (2d Cir.1997) (citing a specific constitutional provision or relying on federal constitutional precedents alerts state courts to the nature of the claim); *Levine v. Commissioner of Correctional Servs.,* 44 F.3d 121, 124 (2d Cir.1995); ("A habeas petitioner in state court is not required ... to cite 'chapter and verse' of the Constitution to satisfy the exhaustion rule.... Instead, he may fairly apprize the state court of a federal constitutional claim by relying on federal and state cases that employ a constitutional analysis, asserting the claim in terms that 'call to mind a specific right protected by the Constitution,' or alleging facts that fall 'well within the mainstream of constitutional litigation.' "); *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992) ("Although we have indicated that 'we think it would be better practice for counsel when relying on a broad constitutional doctrine like the Fourteenth Amendment to support the claim with a factual premise and by citation to federal cases' a minimal reference to the Fourteenth Amendment satisfies the exhaustion requirement."); *Blissett v. Lefevre,* 924 F.2d 434, 438 (2d

Cir.) ("petitioner's brief to the Appellate Division, ... asserted that he was deprived of his 'due process right to a fair trial' guaranteed by the Fourteenth Amendment.... Petitioner's brief clearly laid out the facts underlying his legal claims and his theory.... This was more than sufficient to apprise the state appeals court of petitioner's federal constitutional claims."), *cert. denied,* 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991); *Fernandez v. Dufrain,* 11 F.Supp.2d 407, 415 (S.D.N.Y.1998) (Kaplan, D.J. & Peck, M.J.) ("Under Second Circuit decisional law, ... reference to the Fourteenth Amendment ... is sufficient to satisfy the exhaustion requirement," citing cases).

Moreover, as the State admits, it "did not call the state [appellate] court's attention to the default" at trial. (State Br. at 36 n. *.) The First Department clearly addressed only the merits of Davis's appeal, without holding that Davis procedurally defaulted on any aspect of his claim. *See People v. Davis,* 232 A.D.2d 209, 209, 648, N.Y.S.2d 79, 80 (1st Dep't 1996). Given the State's failure to raise the issue of procedural bar on direct appeal, and the First Department's failure to rule on any such procedural bar, there is no procedural bar to Davis raising his present claim in his habeas petition. *See, e.g., Harris v. Reed,* 489 U.S. 255, 263 & n. 9, 109 S.Ct. 1038, 1043 & n. 9, 103 L.Ed.2d 308 (1989) (when "a state court has been presented with the federal claim," "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."); *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir.), *cert. denied,* 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997);

*Levine v. Commissioner of Correctional Servs.,* 44 F.3d at 126; *Reid v. Senkowski,* 961 F.2d at 377; *Blazic v. Henderson,* 900 F.2d 534, 537–38 (2d Cir.1990) ("the state's responding brief to the Appellate Division failed to assert that there was any procedural bar to [petitioner's] justification argument.... Given the state's failure to raise the issue of procedural bar in the state appellate courts, [petitioner] is not precluded from raising his present claim in the federal court."); *Rosenfeld v. Dunham,* 820 F.2d 52, 54 (2d Cir.) ("if the state appellate court excuses the procedural failure and considers the merits, then a federal court must also consider the merits of petitioner's challenge when ruling on the availability of federal habeas relief"), *cert. denied,* 484 U.S. 968, 108 S.Ct. 463, 98 L.Ed.2d 402 (1987).

## II. *DAVIS'S PETITION SHOULD BE DENIED ON THE MERITS BECAUSE HE WAS NOT ENTITLED TO A JUSTIFICATION JURY CHARGE UNDER NEW YORK LAW SINCE HE COULD HAVE RETREATED FROM IMMINENT HARM WITH COMPLETE SAFETY*

In order for a petitioner to establish that he is entitled to habeas corpus relief based upon a state court's failure to give a jury charge, the petitioner first must establish that the jury instruction should have been given under state law, and second, that the erroneous jury charge resulted in a federal constitutional deprivation. As the Second Circuit has stated: " 'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law." *Blazic v.*

*Henderson,* 900 F.2d 534, 540 (2d Cir.1990) (quoting *Casillas v. Scully,* 769 F.2d 60, 63 (2d Cir.1985)); *see also, e.g., Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Ellison v. Hoke,* No. 93 CV 3048, 1995 WL 561344 at *3 (E.D.N.Y. Sept. 15, 1995); *Godfrey v. Irvin,* 871 F.Supp. 577, 580 (W.D.N.Y. 1994).

Failure to give a properly requested jury charge does not by itself violate Davis's right to due process. *See, e.g., Blazic v. Henderson,* 900 F.2d at 541 ("A mere error of state law does not deny a defendant his right to due process."); *Schaefer v. Leone,* 443 F.2d 182, 185 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 277, 30 L.Ed.2d 251 (1971). "For an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction violates due process.'" *Blazic v. Henderson,* 900 F.2d at 541 (quoting *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. at 400); *see also, e.g., Casillas v. Scully,* 769 F.2d at 63 ("In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law."); *Carmona v. Artuz,* 96 Civ. 8045, 1997 WL 876737 at *11 (S.D.N.Y. Oct. 7, 1997) ("Jury charges that contain errors, even if they lead to the jury misapplying state law, do not ordinarily give rise to federal habeas corpus relief in non-capital cases.... Rather, an erroneous jury charge must have 'infected the entire trial' to be a cognizable claim in a habeas corpus proceeding."), *report & rec. adopted,* 96 Civ. 8045, 1998 WL 213781 (S.D.N.Y. April 29, 1998); *Ellison v. Hoke,* 1995 WL 561344 at *3; *Godfrey v. Irvin,* 871 F.Supp. at 581. The challenged in-struction is not to be viewed in isolation, but "in the context of the overall charge." *Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. at 400; *see also, e.g., Vargas v. Keane,* 86 F.3d 1273, 1277 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996); *Bramble v. Smith,* 96 Civ. 5905, 1998 WL 395265 at *17 (S.D.N.Y. July 15, 1998); *Carmona v. Artuz,* 1997 WL 876737 at *11; *Godfrey v. Irvin,* 871 F.Supp. at 581. As the Supreme Court has observed, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law," and thus the petitioner's "burden is especially heavy." *Henderson v. Kibbe,* 431 U.S. 145, 155, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977); *accord, e.g., Bramble v. Smith,* 1998 WL 395265 at *17.

The Second Circuit has instructed that, "[a]s a preliminary matter, due process does not require the giving of a jury instruction when such charge is not supported by the evidence." *Blazic v. Henderson,* 900 F.2d at 541; *see also, e.g., Bramble v. Smith,* 1998 WL 395265 at *17.

## A. The Justification Defense Under New York Law

New York Penal Law § 35.15 provides that a person is justified in using physical force in self-defense under the following circumstances:

1. A person may, subject to the provisions of subdivision two, use physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by such other person....

2. A person may not use deadly physical force upon another person under cir-

cumstances specified in subdivision one unless:

(a) He reasonably believes that such other person is using or about to use deadly physical force. *Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of so doing by retreating; . . . .*

(Emphasis added.) As one commentary has noted, New York is more strict on the obligation to retreat than other states. *See, e.g.,* 35 N.Y. Jur.2d *Defenses to Criminal Liability* § 3484 (1995) ("Among the states, there is a difference of opinion as to the necessity of retreating before one is justified in taking the life of an assailant. In some jurisdictions, the view is taken that retreat is not required in the case of a felonious attack, but that where the attack is without felonious intent, the person attacked may not stand his or her ground and kill the adversary if there is any means of escape open. For the most part, New York adheres to this position, although the felonies to repel which deadly physical force may be used without obligation to retreat are limited by statute. In other jurisdictions, however, the right to stand one's ground is given broader scope.").

In *In re Y.K.,* 87 N.Y.2d 430, 639 N.Y.S.2d 1001, 663 N.E.2d 313 (1996), the New York Court of Appeals explained that Penal Law § 35.15 imposes a three part test to determine whether the use of deadly physical force was justified: first, whether defendant subjectively believed deadly physical force was necessary; second, whether this belief was objectively reasonable; and third, whether defendant could have retreated with safety:

In *People v. Goetz,* [68 N.Y.2d 96, 115, 506 N.Y.S.2d 18, 29–30[, 497 N.E.2d 41] (1986) ] we explained that the justifica-

tion statute imposes a two-part test which involves both subjective and objective components. When a defendant claims the use of force was justified, the fact finder must first determine if defendant believed physical force (or deadly physical force) was necessary to defend against the imminent use of physical force (or deadly physical force). That is the subjective component. If the People fail to disprove defendant believed physical force was necessary, the fact finder must next consider whether defendant's belief was reasonable, that is, whether a reasonable person would have held that belief under the circumstances which existed. It is not enough that the defendant believed that the use of force was necessary under the circumstances; his reactions must be those of a reasonable person similarly confronted. . . . That is the objective component.

*If the case involves the use of deadly physical force and the fact finder determines that the use of such force was subjectively and objectively reasonable under the circumstances, then the fact finder must determine whether defendant could retreat with safety. If a defendant confronted with deadly physical force knows retreat can be made with complete safety and fails to do so, the defense is lost.*

*In re Y.K.,* 87 N.Y.2d at 433–34, 639 N.Y.S.2d at 1003, 663 N.E.2d 313 (emphasis added); *see also, e.g., People v. Wesley,* 76 N.Y.2d 555, 559, 561 N.Y.S.2d 707, 709–10, 563 N.E.2d 21 (1990); *People v. Snell,* 256 A.D.2d 480, 682 N.Y.S.2d 80, 80 (2d Dep't 1998); *People v. Hayes,* 248 A.D.2d 635, 635, 669 N.Y.S.2d 953, 954 (2d Dep't 1998); *People v. Young,* 240 A.D.2d 974, 976, 659 N.Y.S.2d 542, 543 (3d Dep't), *appeal denied,* 90 N.Y.2d 1015, 666 N.Y.S.2d 110, 688 N.E.2d 1394 (1997); *People v. Roldan,* 222 A.D.2d 132, 138, 647 N.Y.S.2d

179, 183 (1st Dep't 1996); *People v. Hall,* 220 A.D.2d 615, 615, 633 N.Y.S.2d 39, 39–40 (2d Dep't 1995); *People v. Counts,* 214 A.D.2d 897, 898, 625 N.Y.S.2d 697, 698 (3d Dep't), *appeal denied,* 86 N.Y.2d 792, 632 N.Y.S.2d 506, 656 N.E.2d 605 (1995), appeal denied 86 N.Y.2d 800, 632 N.Y.S.2d 514, 656 N.E.2d 613 (1995); *In re Ismael S.,* 213 A.D.2d 169, 171, 623 N.Y.S.2d 571, 573 (1st Dep't 1995); *People v. Hagi,* 169 A.D.2d 203, 210, 572 N.Y.S.2d 663, 667–68 (1st Dep't), *appeal denied,* 78 N.Y.2d 1011, 575 N.Y.S.2d 819, 581 N.E.2d 1065 (1991); *Brown v. Artuz,* 124 F.3d 73, 81 (2d Cir. 1997), *cert. denied,* 522 U.S. 1128, 118 S.Ct. 1077, 140 L.Ed.2d 135 (1998); *Blazic v. Henderson,* 900 F.2d 534, 540 (2d Cir. 1990).

Under New York law, reasonableness is determined based on the circumstances facing the defendant, including his knowledge of the deceased's violent nature. As the New York Court of Appeals explained:

Evidence that the defendant knew of prior acts of violence by the deceased could help establish his requisite beliefs [*i.e.,* subjective belief that he faced imminent harm]. Moreover, such knowledge would also be relevant on the issue of [objective] reasonableness, as the jury must consider the circumstances a defendant found himself in, which would include any relevant knowledge of the nature of persons confronting him.

*People v. Goetz,* 68 N.Y.2d at 113, 506 N.Y.S.2d at 29, 497 N.E.2d 41; *see also, e.g., People v. Wesley,* 76 N.Y.2d at 559, 561 N.Y.S.2d at 710, 563 N.E.2d 21 ("Evidence of a defendant's 'circumstances' includes relevant knowledge that the defendant may have had about the victim ... and any prior experiences that the defendant may have had...."); *People v. Miller,* 39 N.Y.2d 543, 551, 553–54, 384 N.Y.S.2d 741, 747, 748, 349 N.E.2d 841 (1976) ("a defendant in a criminal case,

where justification ·is an issue, [must be permitted] to introduce evidence of the victim's prior specific acts of violence. of which the defendant had knowledge"); *People v. Hagi,* 169 A.D.2d at 210, 572 N.Y.S.2d at 667–68; *People v. Powell,* 168 A.D.2d 393, 394, 563 N.Y.S.2d 402, 402–03 (1st Dep't 1990), *appeal denied,* 78 N.Y.2d 972, 574 N.Y.S.2d 952, 580 N.E.2d 424 (1991); *People v. Rivera,* 138 A.D.2d 169, 174, 530 N.Y.S.2d 802, 805 (1st Dep't) ("[A] determination of reasonableness must be based on the circumstances facing a defendant and his situation. Those circumstances include any relevant knowledge the defendant had about the potential assailant and any prior experiences defendant had which could provide a reasonable basis for his belief that the other person intended to use deadly physical force."), *appeal denied,* 72 N.Y.2d 923, 532 N.Y.S.2d 857, 529 N.E.2d 188 (1988).

Justification "is an ordinary defense rather than an affirmative one.... As such, whenever justification is sufficiently interposed by the defendant, the People must prove its absence to the same degree as any element of the crime charged." *People v. McManus,* 67 N.Y.2d 541, 546–47, 505 N.Y.S.2d 43, 46, 496 N.E.2d 202 (1986); *see also, e.g., In re Y.K.,* 87 N.Y.2d at 433, 639 N.Y.S.2d at 1003, 663 N.E.2d 313; *People v. Steele,* 26 N.Y.2d 526, 528, 311 N.Y.S.2d 889, 891, 260 N.E.2d 527 (1970); *In re Ismael S.,* 213 A.D.2d at 171–72, 623 N.Y.S.2d at 573; *People v. Veitia,* 171 A.D.2d 461, 461, 566 N.Y.S.2d 868, 868 (1st Dep't), *appeal denied,* 78 N.Y.2d 976, 574 N.Y.S.2d 956, 580 N.E.2d 428 (1991); *People v. Jackson,* 154 A.D.2d 930, 930, 547 N.Y.S.2d 164, 164 (4th Dep't), *appeal denied,* 74 N.Y.2d 949, 550 N.Y.S.2d 284, 549 N.E.2d 486 (1989), *error coram nobis denied· mem.,* 213 A.D.2d 1085, 625 N.Y.S.2d 998 (4th Dep't 1995); *Tate v. Wood,* 963 F.2d 20, 23 (2d Cir.1992); *Blazic v. Henderson,* 900 F.2d at 542.

In determining whether the evidence warrants the giving of a justification charge, New York courts have repeatedly emphasized that the evidence is to be construed in the light most favorable to the defendant. *See, e.g., People v. Magliato,* 68 N.Y.2d 24, 29, 505 N.Y.S.2d 836, 840, 496 N.E.2d 856 (1986); *People v. McManus* 67 N.Y.2d at 549, 505 N.Y.S.2d at 48, 496 N.E.2d 202; *People v. Padgett,* 60 N.Y.2d 142, 144, 468 N.Y.S.2d 854, 856, 456 N.E.2d 795 (1983); *People v. Watts,* 57 N.Y.2d 299, 301, 456 N.Y.S.2d 677, 678, 442 N.E.2d 1188 (1982); *People v. Steele,* 26 N.Y.2d at 529, 311 N.Y.S.2d at 891–92, 260 N.E.2d 527; *People v. Vecchio,* 240 A.D.2d 854, 855, 658 N.Y.S.2d 720, 721 (3d Dep't 1997); *People v. Rivera,* 138 A.D.2d at 174, 530 N.Y.S.2d at 805. "When evidence at trial viewed in the light most favorable to the accused, sufficiently supports a claimed [justification] defense, the court should instruct the jury as to the defense, and must when so requested. . . . As a corollary, when no reasonable view of the evidence would support a finding of the tendered defense, the court is under no obligation to submit the question to the jury." *People v. Watts,* 57 N.Y.2d at 301, 456 N.Y.S.2d at 678, 442 N.E.2d 1188; *see also, e.g., People v. McManus* 67 N.Y.2d at 549, 505 N.Y.S.2d at 48, 496 N.E.2d 202; *People v. Padgett,* 60 N.Y.2d at 144–45, 468 N.Y.S.2d at 856, 456 N.E.2d 795.

### B. *Viewing The Evidence In The Light Most Favorable to Davis, The Jury Could Have Found That Davis Reasonably Believed That Bubblegum Was Going To Use Deadly Force Before Davis Shot Bubblegum In The Back*

As noted above, the trial judge did not explicitly state why she did not give the justification charge, but appears to have focused on the duty to retreat. *See* page 16 above. The First Department, however, was of the view that the trial court properly declined to give the justification charge because Davis acknowledged that he did not see a weapon on Bubblegum, and did not give Bubblegum a chance to turn around before shooting him in the back. *People v. Davis,* 232 A.D.2d 209, 209, 648 N.Y.S.2d 79, 80 (1st Dep't 1996). In addition, the First Department found that Davis claimed that Bubblegum kept looking at him right before the shooting and he feared that Bubblegum would attack him, but "did not explain why that final encounter posed a threat of deadly physical force when their previous exchanges of glances minutes earlier did not." *Id.* The First Department also noted that Davis did not offer a convincing reason as to why he did not retreat. *Id.*

Viewing the evidence in the light most favorable to Davis, the Court does not agree with the First Department that Davis had to see Bubblegum's weapon before shooting. Davis knew from personal experience that Bubblegum carried a gun, since Bubblegum had pulled a gun on Davis three times already, including when he raped and robbed Davis three to four weeks before the current incident. (Davis, Tr2. at 44–52.) Davis also knew from personal experience that Bubblegum often worked with others to set up his victims. (*Id.* at 35–38, 44–52.) Therefore, when Davis saw Bubblegum talk to a man on the corner of the block and then walk across the street toward Davis with a woman by his side, it was reasonable for Davis to think he was being set up again for another robbery or other life-threatening act of violence. Bubblegum also was noticeably high on PCP at the time (Symonette, Tr1. at 485–87), which often makes a person violent. (Hayes, Tr1. at 635.) Most importantly, the last time Bubblegum attacked Davis, he threatened to kill Davis

the next time he saw him. (Davis, Tr1. at 50, 58.)

Given these circumstances, the fact that Davis did not see a weapon on Bubblegum is not dispositive. Although the facts may be close, looked at in the light most favorable to Davis, the jury could have found that Davis reasonably perceived, based upon his prior experiences with Bubblegum, that when Bubblegum reached for his waist and turned, Bubblegum was about to take out a weapon and use it against him. *See, e.g., People v. Goetz,* 68 N.Y.2d 96, 101, 106, 506 N.Y.S.2d 18, 21, 24, 497 N.E.2d 41 (1986) ("the prosecutor correctly chose to charge the justification defense" where defendant "stated that he knew from the smile on [victim's] face that they wanted to 'play with me'. Although he was certain that none of the youths had a gun, he had a fear, based on prior experiences, of being 'maimed.'"); *People v. Williams,* 151 A.D.2d 276, 276–77, 542 N.Y.S.2d 186, 187 (1st Dep't 1989) (trial court erred in not giving justification charge to jury because "there is a version of the incident that before taking out his knife, defendant, in the course of a beating, perceived that [the victim] was about to take out a weapon and use it against him" even though defendant saw no such weapon); *People v. Rivera,* 138 A.D.2d 169, 172, 174, 530 N.Y.S.2d 802, 804, 805–06 (1st Dep't) (trial court should have given justification charge where defendant shot victim who perpetrated a "relentless terror campaign against defendant and his family" when victim "lifted up his buttoned jacket and made a movement as if to reach for a black object in his waistband. [Although] [d]efendant did not know whether the black object was a gun or a knife."), *appeal denied,* 72 N.Y.2d 923, 532 N.Y.S.2d 857, 529 N.E.2d 188 (1988); 40 Am.Jur.2d *Homicide* § 154 at p. 625 (1999) ("Killing an assailant may be excusable, although it turns out afterward that there was no actual danger, if it is done under a reasonable apprehension of loss of life or great bodily harm."); *cf. People v. Reeder,* 209 A.D.2d 551, 552, 618 N.Y.S.2d 839, 839–40 (2d Dep't 1994) (defendant's force was not justified because, "[w]hile both eyewitnesses to the shooting testified that the victim reached into his coat pocket in a manner that made it appear as if he was reaching for a gun, one of the witnesses heard the defendant ask the victim, 'why were you bluffing?' before opening fire."), *appeal denied,* 85 N.Y.2d 913, 627 N.Y.S.2d 336, 650 N.E.2d 1338 (1995); *Brown v. Artuz,* 124 F.3d 73, 81 (2d Cir. 1997) (no right to use deadly force, because victim was unarmed and "nothing in the record suggests that [petitioner] somehow believed, mistakenly, that [the victim] possessed a weapon at any time during their struggle"), *cert. denied,* 522 U.S. 1128, 118 S.Ct. 1077, 140 L.Ed.2d 135 (1998).

The Court also disagrees that Davis did not explain why he shot Bubblegum when he did as opposed to minutes earlier. Davis explained at trial that he shot Bubblegum only after he saw Bubblegum reach for his waist and turn toward him, because at that point he "thought [Bubblegum] was going to shoot [him]." (Davis, Tr2. at 72.)

Further, the Court disagrees that as a matter of law Davis should have given Bubblegum a chance to turn around before shooting him. A jury could have found that Davis reasonably believed that if he had waited to see whether Bubblegum had a gun on him this time, as he had previously, Bubblegum could have shot Davis before he could defend himself.

Thus, the Court turns to the final reason given by the First Department, and the only reason on which the trial court ap-

pears to have based its decision—the duty to retreat.

### C. *Davis Was Not Entitled To a Justification Charge Under New York Law Because He Did Not Retreat From Imminent Deadly Harm When He Had the Opportunity To Do So Safely*

Davis argues that deadly force was not imminent until Bubblegum turned and reached for his waist, at which point he could not have safely retreated. (Davis Br. at 61–62; Davis Reply Br. at 15–16.) The State argues that Davis had a duty to retreat when he first saw Bubblegum, since Bubblegum was a deadly threat all along. (State Br. at 46–52.)

As the trial court noted (Colloquy, Tr2. at 295, 318), *People v. Rivera*, 138 A.D.2d 169, 530 N.Y.S.2d 802 (1st Dep't), *appeal denied*, 72 N.Y.2d 923, 532 N.Y.S.2d 857, 529 N.E.2d 188 (1988), is helpful in defining Davis's duty to retreat, because of its somewhat similar fact pattern. In *Rivera*, the deceased lived next door to Rivera and his family. *Id.* at 171, 530 N.Y.S.2d at 803. Shortly after moving in, the deceased engaged in "a campaign of harassment against defendant and his family." *Id.* Over a period of two and a half years, the victim displayed a knife to Rivera's common-law wife, threatened to kill her and her son, drilled a peephole through the bathroom wall to view Rivera's wife, and made obscene remarks over the phone and through the wall. *Id.* The deceased "also threatened defendant's life on several occasions, at times displaying a knife." *Id.* The deceased also had a reputation for violence. *Id.* On the day of the shooting, the deceased approached Rivera and Rivera saw "what appeared to be the handle of a knife." *Id.* at 171, 530 N.Y.S.2d at 804. The deceased threatened to kill Rivera and his family. *Id.* Rivera returned

home, got a gun, and prepared his family to move to his mother-in-law's house. *Id.* The deceased followed Rivera as he and his family moved. *Id.* at 172, 530 N.Y.S.2d at 804. When Rivera got his family inside his mother-in-law's, he returned outside, confronted the deceased, and asked the deceased why he was following them. *Id.* The deceased responded that he was going to kill Rivera and his family. *Id.* At the same time, the deceased raised his jacket and made a movement as if to reach for a black object in his waistband, so Rivera, fearing for his and his family's life, pulled out a gun and shot the deceased, who died shortly thereafter. *Id.*

The First Department in *Rivera* held that a justification charge, including defense of third parties, was warranted, because:

[T]he actual confrontation occurred against a backdrop of a relentless terror campaign against defendant and his family. Defendant knew that he, as well as his wife and child, were under threat of death. He had also heard of other aggressive acts by [the deceased]. On the day of the homicide, [the deceased] increased the tension by threatening to kill them all that day and by pursuing them with a weapon to their mother-in-law's house. *Under these circumstances defendant could reasonably have believed the safety of his family from imminent deadly attack was not guaranteed by their entrance into the building. Defendant could have reasonably feared that after disposing of him (defendant), [the deceased] would proceed into the mother-in-law's building in pursuit of [his wife] and her son.*

*Id.* at 174, 530 N.Y.S.2d at 805–06 (emphasis added).

Like in *Rivera*, Bubblegum terrorized Davis, robbing him three times and raping him, all at gun point. He also expressly

threatened to kill Davis the next time he saw him. (Davis, Tr2. at 50–51.) But unlike the defendant in *Rivera*, Davis could have safely retreated when he first left to get a gun. Davis testified that Bubblegum did not follow him when he went around the corner to get a gun. (*Id.* at 103–06.) Nor was there a history of Bubblegum following Davis and relentlessly pursuing him, like in *Rivera*. Further, Davis did not testify that he could not have remained safely in "the spot," only that he "was not thinking straight" and did not ask if he could stay there. (*Id.* at 107, 109.) Even if Davis could not have remained in "the spot," Davis admitted that when he came out of the building, he could have safely walked away from Bubblegum, but instead chose to return to the zone of danger:

> Q. Mr. Davis, the question I am asking you, when you come out of the building and are standing on the sidewalk of 146th Street between Amsterdam and Broadway you looked right, you could not see [Bubblegum], correct?
>
> A. I could not see him.
>
> Q. You looked left, you could not see him?
>
> A. No, I could not see him.
>
> Q. At that point you could have taken a left hand turn and continued on your way, is that not correct?
>
> . . . .
>
> A. I said I wasn't thinking right.
>
> . . . .
>
> Q. *So basically when you went up to the corner you were going to lay in wait for Bubblegum to see what he would do to you; is that right?*
>
> A. *Yes, I did.*

(*Id.* at 112–13, emphasis added; *see also* pages 396–97 above.)

Davis testified that he was afraid of Bubblegum as soon as he saw him, before he got the gun, because Bubblegum had threatened to kill him, and because Bubblegum usually carried a gun. (*Id.* at 50–51, 103.) It was at this point, therefore, that Davis reasonably believed that Bubblegum was about to use deadly physical force on him, and that Davis had a duty to retreat (*see* State Br. at 45–47.) Moreover, Davis testified that when he previously saw Bubblegum, he hid from him. (Mooney, Tr1. at 606; Davis, Tr2. at 40.) This time Davis did not retreat because he "wasn't thinking right." (Davis, Tr2. at 113.) Yet a reasonable person in Davis' shoes would have retreated upon seeing the man who threatened his life three or four weeks ago and who usually carried a gun. The State's brief persuasively, in the Court's view, explains why Davis had a duty to retreat before he got the gun:

> In fact, as the Appellate Division noted in its decision, if there was any truth to petitioner's claim that he had subjectively feared the use of deadly physical force by Leonard [Bubblegum], that fear would necessarily have been aroused when petitioner first saw Leonard on the street, before petitioner got the gun. As the state explained in its brief to the Appellate Division, *if petitioner was right about Leonard presenting a deadly threat, that threat must have been ongoing.*
>
> Indeed, petitioner always claimed it was, and, by his own account, always acted as if it was. Certainly, what petitioner claimed Leonard had done on the street was totally innocuous unless he had been a deadly threat all along. *Leonard can hardly have offered so little threat to petitioner before the shooting that petitioner had no duty to retreat from his presence at that time, but so great a threat when he added a hand motion to whatever he had been doing before then that petitioner was entitled*

to kill him. *An individual cannot thus put himself near someone who will represent a deadly threat if he makes any sort of movement at all, and then argue that he was not required to avoid that situation.* Having purportedly been aware of his danger, petitioner armed himself and deliberately placed himself in close proximity to the source of that danger when there was clearly no need to do so. *If it was true that petitioner believed Leonard was armed and intended to kill him, he did not have to wait for the final, overt consummation of that intent to realize he should retreat.* Thus, the court correctly denied his request for a charge on justification.

*Petitioner's own testimony confirmed that his purported fear was premised not on what Leonard was doing when petitioner shot him, but on their previous experiences.* The whole thrust of petitioner's claim at trial was not that he had killed Leonard because he had seen him turn around, or even because he had seen him move his hand, but because of what had gone on before, which had made him fear Leonard at all times and whatever he was doing. Petitioner himself stated that Leonard had previously threatened to kill him, and that he had gone to get the gun in the first place because when he had seen Leonard whisper to another man and look in his direction on the street on the night of the murder, he had thought he was being "set up." Had petitioner not feared that the deadly danger was imminent at even that early stage, he would not have felt the need to go out and arm himself—unless, of course, he wanted to kill Leonard for other reasons.

For that matter, petitioner never suggested in his testimony that he had not been in mortal fear of Leonard all through the encounters that preceded the shooting; notably, when he was asked if he could not have retreated and avoided Leonard when he went to get the gun, petitioner did not claim that he had failed to do so because Leonard had presented no threat at that time, but because he had "panicked" and not been "thinking right," a tacit concession that retreat would have been the appropriate response. Thus, as the trial court concluded, the duty to retreat arose at that time, and petitioner's failure to retreat at that point vitiated his entitlement to a justification charge.

(State Br. at 46–48, record citations omitted & emphasis added.)

Accordingly, Davis was not entitled to a justification charge under New York law because he failed to retreat when he had the opportunity to do so safely. *See, e.g., People v. Russell,* 91 N.Y.2d 280, 289–90, 670 N.Y.S.2d 166, 168–69, 693 N.E.2d 193 (1998) ("defendants approached one another on . . . a grassy open area," and "it was evident that an encounter between them would be violent", yet "[d]espite the palpable threat, [defendant], armed with a nine millimeter Glock, did not flee with this friends. Rather, he continued toward [two other defendants], tacitly accepting their invitation and issuing one of his own. . . . Here, there was evidence that defendants did not avail themselves of opportunities for safe retreat, choosing instead to use deadly force against each other. As such, there was adequate support for each jury's rejection of defendants' justification defense."); *People v. Seit,* 86 N.Y.2d 92, 97, 629 N.Y.S.2d 998, 1000–01, 653 N.E.2d 1168 (1995) (in dicta, no justification defense was available because "after [defendant's son] called 911, decedent walked to his van, parked some 40 feet away from the stoop, took off his jacked and left it there. At that point, defendant and his family had the opportunity to leave the stoop and retreat into their apartments. Defendant's actions in failing to do so and in waiting for decedent to return to the

area of the stoop to renew the argument when he had the opportunity to safely retreat, defeat any claim of justification."); *People v. Collice*, 41 N.Y.2d 906, 907, 394 N.Y.S.2d 615, 616, 363 N.E.2d 340 (1977) ("[F]rom the inception of defendant's transaction with his 'enemies' he had initially sought them out for a confrontation, backed away when outnumbered, and then when they followed him to his neighborhood, he shot at them before he had completed his 'retreat' which was largely successful and could have been consummated by withdrawal in complete safety to his home. A jury charge on the issue of justification was, therefore, unnecessary."); *People v. Rattley*, 148 A.D.2d 642, 643, 539 N.Y.S.2d 101, 102 (2d Dep't) (evidence supports jury verdict of no justification where defendant got into a fight with his brother who held a knife, returned to his own room and remained there for a short time, then returned to the scene, took his gun and when his brother came at him with the knife, shot his brother, because "[e]ven if the defendant believed that the decedent was about to use deadly force against him, he was obligated to withdraw from the encounter, since the evidence establishes that he had the ability to retreat in complete safety."), *appeal denied*, 74 N.Y.2d 745, 545 N.Y.S.2d 120, 543 N.E.2d 763 (1989), *habeas corpus dismissed*, 92 CV 2136, 1995 WL 264170 (E.D.N.Y. April 26, 1995); *People v. Reyes*, 116 A.D.2d 602, 602–03, 497 N.Y.S.2d 463, 464–65 (2d Dep't) (justification charge not available where "following the first confrontation between the parties, defendant retreated to his apartment and the decedent did not follow him. Thereafter, defendant returned to the scene of the prior incident carrying a baseball bat and a knife. Even assuming at this point that defendant reasonably believed that the decedent was about to use deadly force against him, he was obligated to withdraw from the encounter rather than use deadly force himself since he had the ability to retreat in complete safety."), *appeal denied*, 67 N.Y.2d 949, 502 N.Y.S.2d 1042, 494 N.E.2d 127 (1986); *People v. Mungin*, 106 A.D.2d 519, 519, 483 N.Y.S.2d 54, 55 (2d Dep't 1984) (no justification defense available as a matter of law when following the first altercation, defendant went to a friend's house, obtained a shotgun, returned to the scene and sought out the decedent, who may have reached for a knife, and shot him, because "defendant concededly had the ability to withdraw and retreat").

Here, as in the cases cited immediately above, Davis had the opportunity to retreat after he first saw Davis on June 22. He used that opportunity not to retreat to safety but to get a gun and return to "lay in wait for" Bubblegum. The Court cannot say that the state trial court's decision not to give a justification charge "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The trial judge correctly applied New York law to the facts as she found them. Under New York law, the trial court "was under no obligation to charge justification if no reasonable view of the evidence established the elements of that defense." *People v. Counts*, 214 A.D.2d 897, 897–98, 625 N.Y.S.2d 697, 698 (3d Dep't 1995), *appeals denied*, 86 N.Y.2d 792, 632 N.Y.S.2d 506, 656 N.E.2d 605 (1995), 86 N.Y.2d 800, 632 N.Y.S.2d 514, 656 N.E.2d 613 (1995); *accord, e.g., People v. Watts*, 57 N.Y.2d 299, 301, 456 N.Y.S.2d 677, 678, 442 N.E.2d 1188 (1982); *People v. Carello*, 241 A.D.2d 903, 905, 660 N.Y.S.2d 515, 516 (3d Dep't), *appeal denied*, 90 N.Y.2d 938, 664 N.Y.S.2d 757, 687 N.E.2d 654 (1997); *People v. Cleveland*, 235 A.D.2d 929, 930, 653 N.Y.S.2d 425, 426 (3d Dep't), *appeal denied*, 89 N.Y.2d 1090, 660 N.Y.S.2d 384, 682 N.E.2d 985 (1997); *People v. Mitchell*, 216 A.D.2d 331, 332, 627 N.Y.S.2d 771, 772 (2d Dep't), *appeal denied*, 86 N.Y.2d 798, 632 N.Y.S.2d 512, 656

N.E.2d 611 (1995); *People v. Odinga*, 143 A.D.2d 202, 204, 531 N.Y.S.2d 818, 820 (2d Dep't), *appeals denied*, 73 N.Y.2d 853, 537 N.Y.S.2d 500, 534 N.E.2d 338 (1988), 73 N.Y.2d 858, 537 N.Y.S.2d 505, 534 N.E.2d 343 (1988); *People v. Ruiz*, 138 A.D.2d 420, 420, 525 N.Y.S.2d 702, 703 (2d Dep't 1988); *People v. Acevedo*, 117 A.D.2d 813, 813–14, 499 N.Y.S.2d 132, 133 (2d Dep't), *appeal denied*, 68 N.Y.2d 665, 505 N.Y.S.2d 1030, 496 N.E.2d 688 (1986); *People v. Alston*, 104 A.D.2d 653, 654, 480 N.Y.S.2d 115, 116 (2d Dep't 1984); *Blazic v. Henderson*, 900 F.2d at 540. The Court, therefore, need not reach the question of whether Davis's due process rights were violated, because he failed to make the threshold showing that the trial court erred as a matter of state law in declining to charge justification.[7] *See, e.g., United States ex rel. Herrington v. Mancusi*, 415 F.2d 205, 211 (2d Cir.1969) ("Since petitioner ... has not established that under New York law, as it now stands, the Supreme Court lacked jurisdiction over his case, we do not reach his due process claim on the merits."); *McEachin v. Ross*, 951 F.Supp. 478, 483–84 (S.D.N.Y.1997) (not reaching due process analysis because the state court's jury instructions were proper); *Ellison v. Hoke*, No. 93 CV 3048 (FB), 1995 WL 561344 at *1 (E.D.N.Y. Sept. 15, 1995) (same); *Styles v. Van Zandt*, 94 Civ. 1863, 1995 WL 326445 at *8–9 (S.D.N.Y. May 31, 1995) (same), *aff'd mem.*, 101 F.3d 684, 1996 WL 281354 (2d Cir.), *cert. denied*, 519 U.S. 936, 117 S.Ct. 313, 136 L.Ed.2d 229 (1996). Accordingly, Davis's habeas petition should be denied.

## CONCLUSION

For the reasons set forth above, the Court recommends that Davis's habeas corpus petition be denied on the merits.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMEN-DATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, 40 Foley Square, Room 426, and to the chambers of the undersigned, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Berman. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

Dated: April 13, 1999.

---

**7.** Davis claims that the failure to charge justification contaminated the juror's analysis of the second degree weapons possession charge. (Davis Br. at 73.) Since refusal to charge justification was not erroneous, the Court need not address this claim.